[Crim. No. 22924. Sept. 1, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
CARL WILLIAM STRITZINGER, Defendant and Appellant.

508

COUNSEL

Friedman & Warner, Kenneth R. Warner and Daniel Friedman for Defendant and Appellant.

Quin Denvir, State Public Defender, and Marjorie C. Swartz, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Otis D. Wright, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MOSK, J.**—Defendant appeals from a judgment convicting him of multiple counts of child molestation. He contends that certain evidentiary rulings at his trial violated his psychotherapist-patient privilege and his right to con-

frontation. As will appear, we conclude that both points are well taken and compel reversal of the judgment.

During a 15-month period ending May 1981 defendant allegedly engaged in various acts of fondling, mutual masturbation, and oral copulation with his stepdaughter Sarah.[1] When Sarah's mother—defendant's wife—learned of these activities she arranged for her daughter and her husband each to see Dr. Walker, a licensed clinical psychologist. During Sarah's counseling session on July 28, 1981, she revealed that she had engaged in sexual activity with her stepfather. Dr. Walker reported the conversation to the child welfare agency that same afternoon.[2] The agency in turn relayed the information to the sheriff's office.

The next day Deputy Buttell of the sheriff's office telephoned Dr. Walker to investigate the child abuse report. Dr. Walker told Buttell that he had seen Sarah the day before, and related the substance of her discussion of sexual relations with her stepfather. He also informed Buttell that he was scheduled to meet with defendant himself later that afternoon, July 29, and with Sarah's older sister two days later, July 31. The deputy asked the doctor to call back after his session with Sarah's sister because he was concerned that she might also be the victim of child abuse. However, he hesitated on the issue of defendant's communications, acknowledging there might be a "confidentiality" problem. This telephone conversation was tape recorded.

Defendant saw Dr. Walker as scheduled, and during his conversation with the psychotherapist discussed his sexual relations with Sarah. Deputy Buttell telephoned the doctor again the next day, July 30, to inquire further about the reported child abuse. When Dr. Walker expressed reservations about disclosing defendant's confidential communications, Buttell read him Penal Code section 11171, subdivision (b), part of the Child Abuse Reporting Act, which he described as providing an applicable exception to the psychotherapist-patient privilege. The doctor then recounted the substance of defendant's session of July 29. This telephone conversation was also tape recorded, and a written report summarizing the conversation was prepared.

---

[1]Sarah turned 14 on July 13, 1980.

[2]Defendant concedes Evidence Code section 1027 provides an exception to the psychotherapist-patient privilege that allowed Dr. Walker to disclose Sarah's confidential communications. The section provides that "There is no [psychotherapist-patient] privilege under this article if all of the following circumstances exist:

"(a) The patient is a child under the age of 16.

"(b) The psychotherapist has reasonable cause to believe that the patient has been the victim of a crime and that disclosure of the communication is in the best interest of the child."

At the opening of trial defendant moved that Dr. Walker's testimony be excluded on the basis of the psychotherapist-patient privilege. (Evid. Code, § 1014.) The court held that Penal Code section 11171, subdivision (b), provides an applicable exception to the privilege and ruled the testimony admissible.

The court also conducted a pretrial hearing to determine whether Sarah could be declared unavailable as a witness under Evidence Code section 240, subdivision (a)(3), so that her preliminary hearing testimony could be admitted as an exception to the rule against hearsay. (Evid. Code, § 1291.) Based solely on Sarah's mother's testimony and on its conclusion that Sarah's testimony would not be damaging to defendant's case, the court held that Sarah was suffering from a mental illness or infirmity and was thus unavailable as a witness. (Evid. Code, § 240, subd. (a)(3).) Her preliminary hearing testimony was therefore ruled admissible.

At trial Dr. Walker testified, over objection, regarding his July 29 consultation with defendant. To refresh the doctor's memory, the district attorney showed him a copy of the report summarizing his second telephone conversation with Deputy Buttell and, in the absence of the jury, played the tape recording of this conversation for him. Sarah's mother also testified and Sarah's preliminary hearing testimony was read to the jury. Deputy Hoberg testified regarding her interview with Sarah, in order to impeach Sarah's preliminary hearing testimony.

Defendant was convicted of one count of lewd and lascivious conduct with a minor, a felony, in violation of Penal Code section 288a, subdivision (b)(2); one count of misdemeanor child molestation, a necessarily included lesser offense under this section, based on an act of oral copulation; and seven counts of misdemeanor child molestation in violation of Penal Code section 647a. The verdict on one of the latter counts was set aside on defendant's motion to dismiss. Defendant was sentenced to three year's probation with ninety days in the county jail.

I

*The Psychotherapist-Patient Privilege and the Child Abuse Reporting Act.*

Defendant first contends that Dr. Walker's testimony regarding the consultation of July 29 was erroneously admitted at trial in violation of the psychotherapist-patient privilege, a relationship subsumed in the right to privacy and defined by statutory provision. On the facts of this case, we agree that the doctor's testimony should have been excluded.

Evidence Code section 1014 provides in part that "the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ." We acknowledged in *In re Lifschutz* (1970) 2 Cal.3d 415, 421 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1], "the growing importance of the psychiatric profession in our modern, ultracomplex society." Thus for reasons of policy the psychotherapist-patient privilege has been broadly construed in favor of the patient. (*Roberts* v. *Superior Court* (1973) 9 Cal.3d 330 [107 Cal.Rptr. 309, 508 P.2d 309]; *Grosslight* v. *Superior Court* (1977) 72 Cal.App.3d 502 [140 Cal.Rptr. 278].) Confidential communications between psychotherapist and patient are protected in order to encourage those who may pose a threat to themselves or to others, because of some mental or emotional disturbance, to seek professional assistance. (*Grosslight* v. *Superior Court, supra,* 72 Cal.App.3d at pp. 507-508.)

 The psychotherapist-patient privilege has been recognized as an aspect of the patient's constitutional right to privacy. (Cal. Const., art. I, § 1; *In re Lifschutz, supra,* 2 Cal.3d at pp. 431-432, citing *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 484 [14 L.Ed.2d 510, 514-515, 85 S.Ct. 1678]; *Ceasar* v. *Mountanos* (9th Cir. 1976) 542 F.2d 1064, 1070.) It is also well established, however, that the right to privacy is not absolute, but may yield in the furtherance of compelling state interests. (*Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 855 [143 Cal.Rptr. 695, 574 P.2d 766]; *Jones* v. *Superior Court* (1981) 119 Cal.App.3d 534, 550 [174 Cal.Rptr. 148]; *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669, 680 [156 Cal.Rptr. 55].)

Thus in *Lifschutz* we held that the patient-litigant exception to the psychotherapist-patient privilege (Evid. Code, § 1016), if narrowly drawn, does not impermissibly invade the patient's right to privacy: "Even though a patient's interest in the confidentiality of the psychotherapist-patient relationship rests, in part, on constitutional underpinnings, all state 'interference' with such confidentiality is not prohibited." (*In re Lifschutz, supra,* 2 Cal.3d at p. 432.) Similarly in *Jones* v. *Superior Court, supra,* 119 Cal.App.3d at page 550, the court concluded that "The constitutional right is by no means absolute. The state's interest in facilitating the ascertainment of truth in connection with legal proceedings is substantial enough to compel disclosure of a great variety of confidential material, including even communications between a psychotherapist and his patient."

To determine whether the psychotherapist-patient privilege embraced by the right to privacy has impermissibly been violated, we begin by considering the state's competing interest. Here that interest is the detection and

prevention of child abuse, and is expressed in the recently enacted Child Abuse Reporting Act. (Pen. Code, § 11165 et seq.) Section 11166, subdivision (a), of the act provides in part that "any child care custodian, medical practitioner, nonmedical practitioner, or employee of a child protective agency who has knowledge of or observes a child in his or her professional capacity or within the scope of his or her employment whom he or she knows or reasonably suspects has been the victim of child abuse shall report the known or suspected instance of child abuse to a child protective agency immediately or as soon as practically possible by telephone and shall prepare and send a written report thereof within 36 hours of receiving the information concerning the incident." Section 11165 of the act provides the following: subdivision (g) defines "child abuse" to include "the sexual assault of a child . . ."; subdivision (i) defines "medical practitioner" to include licensed psychiatrists and psychologists; and subdivision (k) defines "child protective agency" to include a "police or sheriff's department" and a "county welfare department." The scope and substance of the reporting requirement are set out in section 11167. Subdivision (a) thereof states that "A telephone report of a known or suspected instance of child abuse shall include the name of the person making the report, the name of the child, the present location of the child, the nature and extent of the injury, and any other information, including information that led such person to suspect child abuse, requested by the child protective agency." Subdivision (b) further provides that "Information relevant to the incident of child abuse may also be given to an investigator from a child protective agency who is investigating the known or suspected case of child abuse."

■ Together these provisions impose on psychotherapists the affirmative duty to report to a child protective agency all known and suspected instances of child abuse. Lest there be any doubt that the Legislature intended the child abuse reporting obligation to take precedence over the physician-patient or psychotherapist-patient privilege, section 11171, subdivision (b), explicitly provides an exception to these very privileges: "Neither the physician-patient privilege nor the psychotherapist-patient privilege applies to information reported pursuant to this article in any court proceeding or administrative hearing." The Legislature obviously intended to provide specific exception to the general privileges set out in the Evidence Code (Evid. Code, §§ 994, 1014) so that incidents of child abuse might be promptly investigated and prosecuted.

Defendant neither challenges the constitutionality of the child-abuse reporting exception to the psychotherapist-patient privilege, nor argues that the state's interest in protecting children is less than compelling. ■ Rather, he contends that on the particular facts of his case the exception provided in Penal Code section 11171, subdivision (b), was un-

necessarily and therefore erroneously applied to his confidential communications with Dr. Walker. We agree.

■ We begin by recognizing our obligation to construe narrowly any exception to the psychotherapist-patient privilege: we must apply such an exception only when the patient's case falls squarely within its ambit. (*In re Lifschutz, supra,* 2 Cal.3d at p. 435.) We therefore examine in detail the sequence of events in this case.

The record reveals that Dr. Walker contacted the welfare agency immediately after his consultation with Sarah on July 28, before he met with defendant. When Deputy Buttell first telephoned to investigate this report Dr. Walker elaborated in detail on Sarah's revelations. As defendant concedes, Sarah's communications were not privileged because Evidence Code section 1027 provides an exception when, as here, the patient is under 16 years of age and the psychotherapist has "reason to believe that the patient has been the victim of a crime and that disclosure of the communication is in the best interest of the child." (Fn. 1, *ante.*)

After Dr. Walker had seen defendant on July 29, Deputy Buttell called again and asked the psychotherapist to disclose the substance of defendant's communications. Although Buttell persuaded him that the act overrode the privilege and thus elicited the therapist's response, under the circumstances the doctor was not legally obligated to discuss Sarah's case with him again. It is clear from the record that in his own therapeutic consultation defendant gave Dr. Walker no reason to suspect any additional criminal activity, beyond the incidents described by Sarah earlier and already reported. In his first tape-recorded conversation with the deputy Dr. Walker indicated that Sarah had been uncertain how many fondling incidents had occurred but, in response to his questioning, had said she thought there might have been 10 or more. He also related that Sarah had denied there had been oral copulation or sexual intercourse. In his trial testimony Dr. Walker stated that defendant had told him there had been approximately six fondling incidents and, again, no oral copulation or sexual intercourse. Thus defendant at most only confirmed what the doctor had already reported to Deputy Buttell in their first conversation, following Sarah's consultation.

■ Dr. Walker was under no statutory obligation to make a second report concerning the same activity. Had he learned from defendant of possible further child abuse—whether additional incidents involving Sarah, or other incidents with another child—he would, of course, have been required to report these new suspicions. Or, if Dr. Walker had first learned of the fondling incidents from defendant himself, he would have been bound to report that information as provided in the act. However, on the facts of this

case, we conclude that Dr. Walker satisfied his statutory reporting obligation when he divulged Sarah's revelations; he was not required to reiterate his suspicion following consultation with defendant.

The exception to the psychotherapist-patient privilege set out in the Child Abuse Reporting Act applies only to "information reported pursuant to this article . . . ." (Pen. Code, § 11171, subd. (b).) In this case, Dr. Walker reported his suspicion of child abuse following his consultation with Sarah, pursuant to section 11167, subdivision (a), of the act. He was not then required to make a second report of the same incidents, based on defendant's subsequent redundant communications. Although section 11167, subdivision (b), provides that a psychotherapist "may" report "information relevant to the incident of child abuse" beyond the fact of the incident itself, it would be highly inappropriate to apply subdivision (b) in this case. The record makes clear that although Dr. Walker voluntarily reported Sarah's disclosure of her sexual relations with her stepfather, he did not want to disclose defendant's confidential communications on the identical subject. He did so only at the behest of deputy Buttell, who misled him into believing he was required to do so by law. It was therefore error to admit Dr. Walker's testimony concerning his consultation with defendant.

We have recognized the contemporary value of the psychiatric profession, and its potential for the relief of emotional disturbances and of the inevitable tensions produced in our modern, complex society. (See, e.g., *In re Lifschutz, supra,* 2 Cal.3d 415, 421; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 440-441 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) That value is bottomed on a confidential relationship; but the doctor can be of assistance only if the patient may freely relate his thoughts and actions, his fears and fantasies, his strengths and weaknesses, in a completely uninhibited manner. If the psychiatrist is compelled to go beyond an initial report to authorities regarding a suspected child abuse and must thereafter repeat details given to him by the adult patient in subsequent sessions, candor and integrity would require the doctor to advise the patient at the outset that he will violate his confidence and will inform law enforcement of their discussions. Under such circumstances it is impossible to conceive of any meaningful therapy. Ironically, in this case medical help was initially what this distraught family sought as a result of these tragic events.

## II

*The Right to Confrontation and Witness Unavailability.*

Defendant also contends that by declaring Sarah unavailable as a witness and thus allowing her preliminary hearing testimony to be read to

the jury the court deprived him of his federal and state constitutional right to confront witnesses against him and violated similar statutory guarantees. We conclude he is correct on this point as well.

■ The United States Supreme Court has established that a defendant's Sixth Amendment right to confrontation is a fundamental right, applicable to the states through the Fourteenth Amendment. (*Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].) The California Constitution now provides a specific guarantee of the right to confrontation: "The defendant in a criminal cause has the right . . . to be confronted with the witnesses against the defendant." (Cal. Const., art. I, § 15.) A similar guarantee is codified in section 686, subdivision 3, of the Penal Code, which provides that in a criminal action the defendant is entitled "to produce witnesses on his behalf and to be confronted with the witnesses against him, in the presence of the court . . . ."

In *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930], the United States Supreme Court defined the three-fold purpose of the confrontation requirement: (1) to insure reliability by means of the oath, (2) to expose the witness to the probe of cross-examination, and (3) to permit the trier of fact to weigh the demeanor of the witness. (*Id.* at p. 158 [26 L.Ed.2d at p. 497]; see also *People* v. *Green* (1971) 3 Cal.3d 981, 989 [92 Cal.Rptr. 494, 479 P.2d 998].) It is well settled, of course, that the right of confrontation is not absolute. In *Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318], the high court recognized that "there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." (*Id.* at p. 722 [20 L.Ed.2d at p. 258]; accord, *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].) The California Evidence Code is consistent with this formulation. Section 1291 provides in relevant part: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: . . . [¶] (2) the party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

Here defendant did have the opportunity to cross-examine Sarah at the preliminary hearing, although his counsel elected not to question the girl at that time. ■ This tactical decision may not be construed as a waiver of the right to confront the witness. In *Barber* v. *Page, supra,* 390 U.S. 719, the Supreme Court addressed a situation in which defense counsel had de-

clined to cross-examine a preliminary hearing witness who, by the time of trial, had been imprisoned in a foreign jurisdiction. The court held that defendant had not waived the confrontation challenge by counsel's failure to cross-examine the witness at the earlier opportunity, and offered the following observations regarding the preliminary hearing procedure: "we would reach the same result on the facts of this case had petitioner's counsel actually cross-examined [the witness] at the preliminary hearing. [Citation.] The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial. While there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable, this is not, as we have pointed out, such a case." (Id. at pp. 725-726 [20 L.Ed.2d at p. 260].)

Although defense counsel had the opportunity to cross-examine Sarah at the preliminary hearing, the Evidence Code section 1291 exception to the rule against hearsay requires that the preliminary hearing witness be "unavailable" at the time of trial. Evidence Code section 240 in turn defines "unavailable as a witness" to include the witness who is "unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity." (Evid. Code, § 240, subd. (a)(3).) The burden of proof on the issue of witness unavailability rests with the proponent of the evidence, and the showing must be made by competent evidence. (*People* v. *Williams* (1979) 93 Cal.App.3d 40, 51 [155 Cal.Rptr. 414]; *People* v. *Enriquez, supra,* 19 Cal.3d at p. 235.)

Here the only witness at the unavailability hearing was Sarah's mother, defendant's wife. She testified that Sarah had been suffering for some time from emotional difficulties, that she had experienced audio and visual hallucinations, that she had intentionally cut herself several times—most recently two days prior to the hearing—and that she had just been hospitalized following this latest incident. Although the court invited the prosecuting attorney to come forward at a later time with medical testimony in support of the mother's declarations, no physician, psychiatrist, or psychologist ever testified on the unavailability issue.

We conclude that Sarah's mother's testimony on the issue of her daughter's mental health is legally insufficient to support a finding of witness unavailability. Reviewing courts have typically and properly required either

expert testimony on the witness's present condition, or the witness's own express refusal to testify at trial.

For example, in *People* v. *Gomez* (1972) 26 Cal.App.3d 225 [103 Cal.Rptr. 80], the Court of Appeal based its decision sustaining a finding of unavailability on the testimony of two physicians, both staff psychiatrists at the hospital where the witness, the victim of the alleged sex crime, was then under treatment. (*Id.* at p. 228.) The court distinguished cases relied on by the defendant in which police officers had testified regarding the mental condition of the absent witness, but in which no medical testimony had been presented. (*Id.* at p. 230, citing *Sanchez* v. *Bagues & Sons Mortuaries* (1969) 271 Cal.App.2d 188, 193-194 [76 Cal.Rptr. 372].) While refusing to specify the actual nature or severity of the disability required for a finding of unavailability, the court did offer the following general standard: "We agree with appellant that the illness or infirmity must be of comparative severity; it must exist to such a degree as to render the witness's attendance, or his testifying, *relatively impossible and not merely inconvenient.*" (Italics added.) (26 Cal.App.3d at p. 230.)

In *People* v. *Williams* (1979) 93 Cal.App.3d 40 [155 Cal.Rptr. 414], the Court of Appeal rejected a finding that a rape victim who had testified at the defendants' first trial was unavailable to testify at the second trial of a defendant. At the unavailability hearing several persons were called, including the judge from the first trial. He testified that the witness had been under severe emotional strain during the proceedings and on one occasion had collapsed. Although he also stated that the physician who had examined the witness had testified that she was then suffering from colitis, no such evidence was offered at the unavailability hearing to show that this condition had persisted or recurred. The police officer who had testified at the first trial reiterated his description of the witness's physical condition immediately after the sexual attacks. The witness's girl friend, who had accompanied the witness to court during the first trial, testified that the witness had undergone extreme emotional and physical distress and, on learning of the new trial, had told her "Barbara, I can't go through with that again. I can't. I want to put my life together and go on. I am being torn apart." (*Id.* at p. 50.) Finally, the witness's former boyfriend testified that she "had become hysterical" on learning that she would have to testify again. (*Ibid.*)

However, no medical evidence was presented in *Williams* regarding the witness's alleged "mental infirmity" at the time of the hearing. The court concluded that "In the absence of *medical* testimony such as was introduced in *Gomez,* there was no credible evidence . . . to support a finding that, if required to testify [the witness] would suffer any substantial impairment to her mental or physical health—either permanently or for any significant

period of time." (*Id.* at p. 54.) Adopting the test articulated in *Gomez,* the court held that the evidence established only that the absent witness's "mental, emotional and physical condition rendered her ability to testify merely inconvenient and *not* 'relatively impossible.'" (*Ibid.*)

As respondent here points out, neither the *Gomez* nor the *Williams* decision explicitly calls for medical testimony as a specific requirement for a finding of unavailability under the "mental illness or infirmity" provision of Evidence Code section 240. Indeed there is competent evidence in this case, from Sarah's mother, that Sarah was hospitalized and undergoing psychotherapy at the time of the hearing. However, although the mother may be capable of testifying to the *existence* of her daughter's mental illness or infirmity, section 240, subdivision (a)(3), requires that the witness be *"unable* to attend or to testify at the hearing *because* of then existing . . . mental illness or infirmity." (Italics added.) In other words, the evidence must establish not only that there is an illness or infirmity, but also that the condition renders it "relatively impossible"—to use the language of *Williams*—for the witness to appear. This determination generally calls for expert opinion, with supporting reasons, as to the likely effect of the court appearance on the physical or mental health of the witness. The mother's understandably protective testimony was therefore insufficient as a matter of law for this critical purpose.

As an alternative ground for sustaining the finding that Sarah was unavailable as a witness, respondent calls our attention to *People* v. *Rojas* (1975) 15 Cal.3d 540 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127]. In *Rojas* the witness himself testified at the hearing on his unavailability and stated that he had received threats by telephone and by letter, that various acts of violence had been directed toward him and his family, and that he was therefore in desperate fear of his and his family's safety. (*Id.* at pp. 547-550.) He did not invoke the privilege against self-incrimination, and was physically and mentally capable of testifying, yet he absolutely refused to testify. He was found in contempt of court and was detained in juvenile hall for the remainder of the trial. Although no medical testimony was presented at the unavailability hearing, we held that the term "mental infirmity" includes a mental state induced by fear that impels a witness to refuse to testify. (*Id.* at p. 551; accord, *People* v. *Quaintance* (1978) 86 Cal.App.3d 594, 600 [150 Cal.Rptr. 281].)

The record here indicates that Sarah spent one night in juvenile hall for refusing to cooperate at the preliminary hearing and for repeatedly answering "I don't know" or "I don't remember" when questioned by the prosecuting attorney. Respondent therefore contends that the situation is analogous to *Rojas,* and argues that Sarah has "constructively" refused to testify

for fear of returning to juvenile hall. This contention is without merit, and *Rojas* is clearly distinguishable.

In *Rojas* the witness who had testified at the preliminary hearing and at the first trial himself appeared at the beginning of the second trial and stated that he would refuse to testify out of fear. The court was therefore able to observe his demeanor to determine whether his fear amounted to a mental infirmity that would render it "relatively impossible" for him to testify. Sarah, however, did not testify at the hearing on her unavailability. The prosecution offered only her mother's testimony that Sarah was afraid that if she took the stand she might again be sent to juvenile hall for failing to answer questions properly.[3] While in *Rojas* there was "no challenge made to the sufficiency of the evidence supporting the trial court's determination that the fear was justified" *(People* v. *Rojas, supra,* 15 Cal.3d at p. 550), here it is the very sufficiency of the mother's testimony, supported neither by expert evidence nor by Sarah's own words, that is at issue. In *Rojas* we were asked to determine whether fear might constitute a mental infirmity for purposes of witness unavailability; here Sarah's subjective fear has not been established by the evidence.

Furthermore, although in *Rojas* we held that fear may constitute a mental infirmity rendering a witness unavailable, we also compared the witness who refuses to testify with the witness who invokes the privilege against self-incrimination or who is physically absent from the hearing: "No [] [sufficient] reason appears to us why the former testimony of a witness who is present in court but refuses to testify because he is in fear . . . should not be used when that of a witness, who claims privilege or who is absent from the hearing and his attendance cannot be compelled or procured, can be used." *(Id.* at p. 551.) No such analogy to the privilege exemption or to physical absence is possible in this case, because Sarah herself did not personally refuse to testify.

We conclude that Sarah should not have been declared unavailable as a witness under Evidence Code section 240, subdivision (a)(3). Her preliminary hearing testimony was therefore erroneously admitted into evidence, as was Deputy Hoberg's testimony purporting to impeach Sarah's declarations. Defendant was thus denied the constitutional right to confront the principal witness against him, the alleged victim of the offenses charged, while respondent was permitted to impeach that witness's former testimony.

---

[3]It is significant that Sarah's mother stressed her daughter was not afraid of testifying about the alleged incidents themselves, but was simply and categorically afraid that, however she testified, she might be sent to juvenile hall again for her inability to remember or for otherwise failing to answer questions to the satisfaction of the court. Had she appeared, the trial judge would have been able to reassure her that she would not be punished if she were truthful.

■ Because this error is of federal as well as state constitutional dimension, violating as it does the defendant's right to confrontation guaranteed by the Sixth Amendment to the United States Constitution, we must apply the reversible error test set out in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People* v. *Arcega* (1982) 32 Cal.3d 504, 525 [186 Cal.Rptr. 94, 651 P.2d 338].) This test provides that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].) The burden is on the beneficiary of the error "either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." (*Ibid.*; see also *People* v. *Spencer* (1967) 66 Cal.2d 158, 168 [57 Cal.Rptr. 163, 424 P.2d 715].) The *Chapman* court reiterated the approach it adopted in *Fahy* v. *Connecticut* (1963) 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229]: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." (*Id.* at pp. 86-87 [11 L.Ed.2d at p. 173]; see also *People* v. *Powell* (1967) 67 Cal.2d 32, 56-57 [59 Cal.Rptr. 817, 429 P.2d 137].) Where a fundamental constitutional right is at issue, erroneous evidentiary rulings are seldom harmless under this standard: "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." (*Chapman* v. *California, supra,* 386 U.S. at pp. 23-24 [17 L.Ed.2d at p. 710].) Further, we must weigh the impact of the error not only on the decision of the jury, but also on the course of the trial. (*People* v. *Spencer, supra,* 66 Cal.2d at p. 163.)

■ It is surely "reasonably possible" in this case that Sarah's preliminary hearing testimony influenced the jury in its decision to convict defendant of the one felony and several misdemeanor charges. Viewing the record without Sarah's former testimony we are left with very little evidence. We exclude Deputy Hoberg's testimony in this analysis because it was introduced solely for impeachment. Because we have determined that Dr. Walker's testimony was erroneously admitted in violation of the psychotherapist-patient privilege, we view the record absent this testimony as well. We are left, then, with only the testimony of Sarah's mother, defendant's wife, who contributed negligibly to the prosecution's case. She testified at some length as to Sarah's personality and described her mental and emotional problems. When asked if she had discussed with her husband his sexual relations with Sarah she responded, reluctantly: "All right. It was something of the nature that Sarah had told me that some things had occurred between she and my husband, also between she and a shepherd and between she and a neighbor boy and that I had taken Sarah to see Dr. Walker and that I felt that we had a problem which had to be faced. Whether or not what Sarah said was the truth was a problem in our household." Attempts to elicit more specific

testimony as to the nature of defendant's sexual relations were unsuccessful. It is therefore probable that the jury would not have convicted defendant of any crime based on her testimony alone.

Looking at Sarah's preliminary hearing testimony itself to evaluate its possible injurious effect on defendant's case, we are persuaded that her statements, however contradictory, reluctant or confused, did contribute to the conviction. While she was often evasive and uncertain in her responses, she conceded that a number of mutual fondling episodes had taken place and, if not in explicit language, suggested that an alleged oral copulation incident had occurred, described an incident of masturbation and ejaculation, and stated that one or two incidents involved the use of a vibrator. Although Sarah's credibility may have been questioned by the jury, her preliminary hearing testimony undoubtedly contributed to defendant's detriment.

Considering the effect of the error on the course of defendant's trial, we note again that but for the admission into evidence of Sarah's former testimony, Deputy Hoberg would not have been permitted to testify to impeach this testimony. That witness would have been limited to testimony regarding her own observations of Sarah during their interview, and to disclosing whatever of Sarah's statements might have been admissible under some other exception to the rule against hearsay, if any. Thus we are unable to conclude that the erroneous admission into evidence of Sarah's preliminary hearing testimony was harmless beyond a reasonable doubt.

The judgment is reversed.

Bird, C. J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**KAUS, J.,** Concurring and Dissenting.—While I concur in the result, I reach the conclusion that Dr. Walker's testimony concerning his session with defendant was inadmissible by a different route than the majority. On the question of the inadmissibility of lay testimony concerning Sarah's availability, I respectfully dissent.

### I.

On the first issue—Dr. Walker's testimony—there is obviously something revolting about the spectacle of a psychotherapist testifying to a patient's[1]

---

[1] The People claim that defendant was not a patient of Dr. Walker. They overlook that they stipulated that he was. At the outset of the proceedings the court announced: "I understand that the parties have agreed to stipulate that Dr. Walker is a psychotherapist . . . and that the defendant, Mr. Stritzinger, was his patient at the time that this evidence that you wish to have excluded developed. That these statements were by Mr. Stritzinger to Dr. Walker while Mr. Stritzinger was a patient and Dr. Walker his psychotherapist." Both sides stipulated to the court's recital.

confidences in a criminal action in which the patient is the defendant. The majority bases its holding that the testimony was inadmissible on its finding that Deputy Buttell misled the doctor into believing that he was required to report the contents of the session with defendant under the Child Abuse Reporting Act (Act) and that Dr. Walker "did not want to disclose defendant's confidential communications" and "did so only at the behest of Deputy Buttell." (*Ante,* p. 514.)

Granting arguendo that under such circumstances the abrogation of the therapist-patient privilege contained in Penal Code section 11171, subdivision (b), would not apply, I do not believe that the record supports the majority's factual assumptions.

First and foremost, Buttell could not possibly have misled Dr. Walker into believing that he was legally compelled to report the interview with defendant. What, according to the majority, made the report optional rather than compulsory, was the fact that it did not yield any new information. Buttell's advice, however, was given before the deputy knew that defendant's talk with Dr. Walker had not yielded anything new.[2]

Second, there is no factual basis for the majority's assumption that but for Buttell's misleading him into believing that the law *required* him to disclose defendant's confidential communications, Dr. Walker would not have disclosed the information. The fact is that we simply do not know what Dr. Walker would have done absent Buttell's intervention. We do know, of course, that Dr. Walker was generally familiar with the Act—otherwise he would not have spontaneously reported the session with Sarah. It is fair to assume that he would have continued to obey his legal duties as he saw them. At no time did Buttell purport to advise him concerning those duties. All that happened was that at the first interview Buttell expressed concern regarding Sarah's sister and himself raised the problem of confidentiality which he tried to lay to rest the next day.[3] On these facts I find it impossible to agree that the record permits us to find, as a matter of law, that but for

---

[2]If the majority opinion becomes law, we might conceivably require that in the future officers in Buttell's position explain the niceties of optional versus compulsory reporting before soliciting information. We can, however, hardly blame Buttell for his lack of clairvoyance.

[3]The contents of that conversation are known to us only through a stipulation: "The following morning, July 30th, 1981, Deputy Buttell called Dr. Walker. Dr. Walker expressed reservations about revealing to the deputy what the defendant had told him during the conversation the previous day. The doctor stated that he thought—he was concerned about privilege.

"At that point Deputy Buttell read to the doctor substantially verbatim Section 11171(b) of the Penal Code and the doctor said something to the effect of well, that about takes care of the privilege.

Buttell's "misleading"—which never happened—Dr. Walker would not have reported the interview with defendant.[4]

Nevertheless I do not believe that Dr. Walker's testimony was admissible. In the area of sexual abuse of children by adults, the law, presumably, has three objectives: to punish the abuser, to identify and protect his victims and to cure him in order to protect future potential victims. Since it is fair to assume that child molesters like to avoid being prosecuted just as much as other criminals, it obviously impedes the objective of cure if therapists who are supposed to effect it are legally bound to testify against their patients in court. Those who do so a few times should not plan on specializing in pedophilia.

Thus the net effect of the abolition of the privilege in Penal Code section 11171, subdivision (b) is likely to be fewer cures, rather than more information leading to conviction and punishment. True or not, this is, of course, a matter of legislative judgment, unless constitutional values are implicated.

In *In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1] we recognized that the psychotherapist privilege has constitutional as well as statutory roots.[5] We held, in effect, that all purported legal invasions of the confidentiality between therapist and patient must be scrutinized in light of constitutionally protected privacy values. (See also Cal. Const., art. I, § 1.)

We are here concerned with a very narrow aspect of the problem of confidentiality. First, we need not inquire to what extent, if any, the Act may clash with the therapist's professional ethics. (Cf. *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 441-442 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Second, we need not trouble ourselves with the therapist's duty to report the interview with defendant to the authorities. Third, we deal with a therapist-patient relation which was not initiated under any kind of legal pressure or compulsion—for example, as

---

[4]It may be unfair to mention it—we have to take our cases as they come along—but something else which bothers me about the majority opinion is that it really does not decide anything except this case. Even if the facts supported the majority's conclusion, Dr. Walker would have been free to testify to defendant's confidences if he had seen defendant before Sarah, or if defendant had related more serious or more frequent sexual misconduct than Sarah.

[5]"We believe that a patient's interest in keeping such confidential revelations from public purview, in retaining this substantial privacy, has deeper roots than the California statute and draws sustenance from our constitutional heritage. In *Griswold* v. *Connecticut, supra,* 381 U.S. 479, 484 [14 L.Ed.2d 510, 514], the United States Supreme Court declared that 'Various guarantees [of the Bill of Rights] create zones of privacy,' and we believe that the confidentiality of the psychotherapeutic session falls within one such zone. (Cf. *People* v. *Belous* (1969) 71 Cal.2d 954, 963 [80 Cal.Rptr. 354, 458 P.2d 194].)"

a condition of probation. Our sole problem is the admissibility in court of defendant's incriminatory statements made during a session which he had every reason to believe was therapeutic and confidential rather than investigatory and a prelude to public testimony.

How do we square the apparent statutory duty imposed on the therapist to testify against his patient with the constitutional privacy which enveloped the interview? The answer, I believe, is obvious and was anticipated at trial by defendant's counsel:[6] during the cross-examination of Dr. Walker, counsel asked whether at the outset of the session with defendant, the doctor had indicated that the conversation would be private and confidential. The prosecutor's objection, made on relevancy grounds, was sustained. To my mind the question went not only to the heart of the constitutional problem, but also pointed to its solution.

Surely, in the setting of this case, the minimum impact of constitutional privacy considerations is a rule which prohibits the therapist from testifying to confidential communications from the defendant-patient, unless the proponent of the evidence first establishes that the patient, before talking to the therapist, had been made aware of the therapist's statutory duty to testify against him concerning the contents of the interview. If, in spite of such awareness, the patient chooses to continue with the interview, he is obviously in no position to cry "foul" in the courtroom.

It may be argued that the requirement of awareness really reads subdivision (b) of section 11171 out of the Penal Code, since the solution is nothing but the concept of waiver—applicable to all privileges (Evid. Code, § 912)—in disguise. Not quite: the abrogation of the privilege would remain viable in other contexts; nothing I have said affects the duty of the therapist to comply with the Act by reporting or, for that matter, to testify in actions where the testimony is not offered against the patient. Further, waiver depends on consent. My suggested resolution merely requires awareness.

I would, therefore, reverse the judgment because the People did not show that when defendant talked to Dr. Walker, he was aware of the doctor's intention to report the contents of the therapeutic session.[7]

---

[6]It is urged before us by the State Public Defender, appearing as amicus curiae.

[7]The fact is that it is by no means certain that they could not have made such a showing. As noted, an objection to the relevant question was sustained. The record shows, however, that some time before defendant saw Dr. Walker, Deputy Buttell and a colleague contacted Sarah and her mother—defendant's wife—revealing inevitably that Dr. Walker had been in touch with the police. Nobody asked whether Mrs. Stritzinger, who of course knew of her husband's appointment later in the day, informed him that the doctor he was about to see had already notified the authorities.

II.

Although I agree that the admission of Dr. Walker's testimony demands a reversal, I must express my dissent from the holding that only expert testimony—or the unavailable witness' own words (*People* v. *Rojas* (1975) 15 Cal.3d 540 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127])—may support a finding that a witness is unavailable because of "mental illness or infirmity." (Evid. Code, § 240, subd. (3).)

While the question of unavailability is, of course, of constitutional dimension (*Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318]; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73]) until today I had never heard that ordinary rules of evidence may not be adequate to prove that the imperative of confrontation has been satisfied.[8]

Without belaboring the point, I am at a loss to understand why the admissibility of evidence to establish unavailability of a witness because of mental problems should be excluded from the provisions of section 870 of the Evidence Code, quoted below.[9] The section is but a recodification of former subdivision 10, of section 1870 of the Code of Civil Procedure.[10] Instances abound in which the rule that close acquaintances are competent to testify to a person's sanity has been applied. (*People* v. *Letourneau* (1949) 34 Cal.2d 478, 498 [211 P.2d 865] [wife]; *People* v. *Nüno* (1920) 183 Cal. 126, 129 [190 P. 626] [employer and fellow worker]; *Matter of Coburn* (1913) 165 Cal. 202, 217 [131 P. 352] [nephew]; *People* v. *Delhantie* (1912) 163 Cal. 461, 468 [125 P. 1066] [prison warden]; *People* v. *Clark* (1907) 151 Cal. 200, 207 [90 P. 549] ["frequent" acquaintance].)

It may well be that so far no case has upheld a finding of unavailability based only on testimony from a lay witness. That does not, however, prove that in principle such testimony cannot suffice. Of course, when a mother tries to protect her daughter from the embarassment of the witness stand, questions of credibility because of interest inevitably arise, but that is hardly

---

[8]Since I agree that the conviction must be reversed, I am more concerned with the principle which the court announces—that a mother's testimony cannot, by itself, support a finding that her daughter is too disturbed to testify—than I am with the question whether the testimony sufficed in this particular case.

[9]"A witness may state his opinion as to the sanity of a person when: (a) The witness is an intimate acquaintance of the person whose sanity is in question; (b) The witness was a subscribing witness to a writing, the validity of which is in dispute, signed by the person whose sanity is in question and the opinion relates to the sanity of such person at the time the writing was signed; *or* (c) The witness is qualified under Section 800 or 801 to testify in the form of an opinion." (Italics added.)

[10]". . .; the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given."

a basis for declaring her testimony incompetent, which, in effect, is what the majority has done.[11]

Of course I do not claim that lay testimony is always sufficient. Where the unavailability depends on a professional prediction of the effect of testimony on the witness' mental health, even a mother's evidence may not suffice. My quarrel is rather with the extraordinary breadth of the court's pronouncement, not its applicability to particular cases.

Wigmore states flatly that "subject to local qualifications and quibbles" lay opinions on questions of sanity "are today everywhere conceded to be admissible." (7 Wigmore, Evidence (Chadbourn rev. ed. 1978) § 1938.) Are we to have a "local quibble" to the effect that however much a witness' testimony may be based on immediate, frequent perception of another, however intimately the witness may know the other, the witness' testimony can never support a finding that the other is unavailable to testify because of mental illness or infirmity?

**RICHARDSON, J.**—I respectfully dissent.

The majority finds prejudicial error was committed in admitting (1) Dr. Walker's testimony regarding defendant's admissions to him that he had sexually abused his stepdaughter Sarah, and (2) Sarah's own preliminary hearing testimony confirming that such abuse had occurred. In my view, *both* Dr. Walker's and Sarah's testimony were admissible and fully support defendant's conviction of child molestation.

### 1. *Dr. Walker's Testimony*

The majority concedes that Dr. Walker's initial report regarding his interview with Sarah was not rendered inadmissible by the psychotherapist-patient privilege. (See Evid. Code, §§ 1014, 1027; Pen. Code, § 11171, subd. (b).) Yet the majority holds that Dr. Walker's supplemental report, discussing his interview with defendant himself, was protected by that privilege. With due respect, this holding is patently incorrect.

The Child Abuse Reporting Act (Pen. Code, § 11165 et seq.) unequivocally provides that the psychotherapist-patient privilege shall not apply "to

---

[11]I thought the last vestige of common law incompetence for interest vanished when the Evidence Code did not perpetuate the dead man's rule (former Code Civ. Proc., § 1880, subd. 3). What, for that matter, is so credible about a gang member who seeks to escape the dilemma of committing perjury or incriminating a friend by claiming that he fears for his life if he testifies? (See *People* v. *Rojas, supra,* 15 Cal.3d 540.) If I had to choose between Mrs. Stritzinger and young Navarette, the witness in *Rojas,* I would certainly not pick him.

information reported pursuant to" the act. (Pen. Code, § 11171, subd. (b).) Thus, if Dr. Walker's supplemental report was made "pursuant to" the act's provisions, the report was unprivileged and Dr. Walker was free to testify regarding its contents.

The act's provisions impose on psychotherapists such as Dr. Walker an affirmative duty to report to a child protective agency all known or suspected instances of child abuse, even though they may learn of such incidents through otherwise confidential communications with their patients. Thus, section 11166, subdivision (a), provides in pertinent part that "any . . . medical practitioner [defined in § 11165, subd. (i), to include psychotherapists] . . . who has knowledge of or observes a child in his or her professional capacity . . . whom he or she knows or reasonably suspects has been the victim of child abuse shall report [by telephone] the known or suspected instance of child abuse to a child protective agency immediately . . . and send a written report thereof within 36 hours of receiving the information concerning the incident."

The majority holds that, because Dr. Walker initially reported Sarah's own communications with him regarding defendant's misconduct, Dr. Walker's statutory obligations were somehow satisfied and permanently discharged and, accordingly, the psychotherapist-patient privilege was revived. It is claimed that the privilege thereafter protected any further disclosure regarding the same incidents of sexual abuse.

With deference, I suggest that the majority's interpretation of the Child Abuse Reporting Act is erroneous. Under section 11171, subdivision (b), the privilege is rendered inapplicable to *any* information "reported pursuant to" the act. The provision is not limited merely to information *required* to be reported thereunder. Certainly Dr. Walker was *permitted* (if indeed, not required) to file a supplemental report which *corroborated* the victim's unsubstantiated charges by reporting admissions from the alleged offender himself. How can it reasonably be argued that such a critical follow-up report, confirming what otherwise might be deemed mere fantasy or fabrication by a young child, was not issued "pursuant to" the act? In my view, in order to carry out the act's salutary purposes, such confirmatory reports should be encouraged and the information contained therein made freely available for use in criminal proceedings. I have no doubt whatever that this was the legislative intent underlying section 11171, subdivision (b).

## 2. *Sarah's Preliminary Hearing Testimony*

Section 1291, subdivision (a), of the Evidence Code permits the admission of preliminary hearing testimony of a witness who is "unavailable" as a

witness at trial. A witness is deemed "unavailable" if he or she is "unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity." (Evid. Code, § 240, subd. (3).) It may be seen that the relevant statutes do not purport to require that the showing of unavailability by reason of mental illness or infirmity must be established by expert medical or psychiatric testimony. Indeed, the majority readily concedes that no appellate court decision requires such testimony as a precondition to establishing unavailability. (*Ante*, p. 517.)

In the present case, Sarah's mother testified at length regarding Sarah's deteriorating mental health. As aptly described by Justice Compton in his opinion for the unanimous Court of Appeal, Second Appellate District, in this case:

"The court relied upon testimony of Sarah's mother who stated that Sarah was hospitalized at a psychiatric center for treatment, that she was emotionally unstable, prone to suicide attempts and that her previous experience of incarceration as a recalcitrant witness during the preliminary hearing had left her extremely fearful of returning to a court to testify.

"The mother also related a several year history of audio and visual hallucinations experienced by the victim which would be exacerbated by stressful situations such as testifying in the present case. The trial court also read the testimony of Sarah as contained in the transcript of the preliminary hearing.

"Evidence Code section 240, subdivision (a)(3), defines 'unavailable' as a witness as 'Dead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity.' Under the circumstances of this case there was no abuse of discretion. It is clear that the victim was suffering from an existing mental infirmity and would be further disabled if subjected to the rigors of a trial. It was not necessary to establish this infirmity by the testimony of a physician.

" '[I]llness or infirmity must be of comparative severity; it must exist to such a degree as to render the witness' attendance, or his testifying, relatively impossible and not merely inconvenient. However, we cannot say just what illness or infirmity must be shown or the degree of its severity, leaving that determination to a trial court's exercise of discretion.' (*People* v. *Gomez* (1972) 26 Cal.App.3d 225, at p. 230 [103 Cal.Rptr. 80].)"

Indeed, the preliminary hearing transcript itself fully supports the testimony of Sarah's mother regarding Sarah's mental infirmity and consequent unavailability at trial. Sarah was a very uncooperative witness throughout

her examination, giving contradictory or ambiguous responses and refusing to elaborate upon the few incidents of sexual abuse which she reluctantly admitted had occurred. At the conclusion of her testimony, when asked if she had told a detective that her stepfather had committed a particular act, she first replied "I don't remember," and then simply answered "I'm not going to answer any more of that." The court ordered her to answer "or I'll put you in jail until you do." Sarah remained obstinate, twice replying "I'm not going to answer it." Accordingly, she was ordered into temporary custody at juvenile hall for contempt of court.

On such a record, the trial court clearly exercised common sense and acted well within its discretion in finding that Sarah was "unavailable" within the meaning of Evidence Code sections 240 and 1291. (See *People v. Rojas* (1975) 15 Cal.3d 540, 551 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127] [witness' refusal to testify constitutes unavailability].)

I would affirm the judgment.