Filed 5/28/26  P. v. Pollano CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RABIRA GIULIANO POLLANO,<br><br>    Defendant and Appellant. | A170505<br><br>(City & County of San Francisco<br>Super. Ct. No. CRI22001523) |

A jury convicted Rabira Giuliano Pollano of felonies related to his domestic violence against his wife.  He appeals, arguing the trial court erroneously admitted evidence and denied him access to mental health records.  We affirm.

## BACKGROUND

In October 2023, the prosecution charged Pollano with kidnapping, assault with a deadly weapon not a firearm, making criminal threats, domestic violence, two counts of grand theft from a person, two counts of dissuading a witness, vandalism, two counts of assault with a firearm, and assault with force likely to cause great bodily injury.  (Pen. Code, §§ 136.1, subd. (b)(1), 207, subd. (a), 245, subds. (a)(1), (2), & (4), 273.5, subd. (a), former 422, 487, subd. (c), 594, subd. (b)(1).)  It also alleged various enhancements, aggravating circumstances, and a prior felony conviction.

1

(*Id.*, §§ 667, subds. (a)(1), (d), & (e), 667.5, subd. (b), 1170.12, subds. (b), (c), 12022.5, subd. (a), 12022.53, subd. (b); Cal. Rules of Court, rule 4.421.)

In February 2022, Pollano and T.D. — his wife since 2019 — argued. After a "severely abusive" marriage and a separation, she told him he needed to move out immediately. The argument escalated, and he began blocking her movements. She slapped him, and he pushed her to the ground and started punching her. He said, " 'you're gonna die tonight,' " moved her to a different room, and continued punching and kicking her.

Justin Urena — a friend of Pollano who was waiting outside — heard yelling and knocked on the door. Pollano left the room to speak with him. When Pollano returned, T.D. was certain he would kill her and begged him not to. He said, " 'I'm gonna hurt you,' " " 'I'm gonna kill you,' " and " 'I'm going to cripple you.' " He also smashed her iPad with a hammer.

Pollano walked T.D. to Urena's car, put her in the back seat, and got into the passenger's seat. Urena drove, and Pollano told him that they were going to " 'kill her' " and he knew a hiking trail with a lake nearby to " 'dump her body in.' " When they arrived, it was pitch black. He told Urena to " '[t]ake her over there. Shoot her. Dump her body in the lake.' " She used pepper spray and tried to run, but Pollano grabbed her shirt. She "maneuver[ed] out of" her shirt and ran, screaming for help as he gave chase.

T.D. ran towards an oncoming car. She screamed, " '[h]elp me,' " " '[h]e's trying to kill me,' " as the car stopped. She got in the back seat, but Pollano got in before she could close the door. Two "younger" girls were in the car. One noticed T.D. had "dark spots all over her face" that could have been "dirt" or "blood." He told the girls " '[t]his is my wife,' " " '[e]verything is fine,' " and " '[w]e don't need anything.' " She repeated " '[h]e's gonna kill me,' " " '[p]lease help me. I'm going to die.' " One of the girls tried to call 911,

2

but he grabbed her phone and threw it behind him.  He also grabbed the other girl's phone.

T.D. told the girls Pollano " 'ha[d] a gun.' "  He told her to " '[s]hut up or I'm really gonna do something stupid.' "  After that, the girls kicked them out. T.D. begged them to let her stay.  The girls cried, and one told her " 'I'm so sorry,' " " 'we're gonna call 911.' "  Once outside the car, one of the girls tried to get her phone back from Pollano but failed.  After the struggle, he pulled T.D. out of the girls' sight.  Meanwhile, the other girl grabbed her phone from the backseat.  The girls left and called 911.

Pollano threw T.D. to the ground and started "wailing" on her.  She tried to scream, but he covered her mouth.  He told her to " '[s]hut the fuck up' " and continued hitting her.  She tried to get up, but he hit her so hard she fell back down.  The two men carried her to the backseat of Urena's car. Pollano sat on her while Urena drove.

In the car, Pollano continued to beat T.D, and she threw up from the stomach blows and felt like she was going to lose consciousness.  One of her earrings lodged in her ear canal.  She kicked Urena to try and cause an accident, but Pollano beat her until she stopped.  After that, she "lay[] there," certain he would kill her.  Meanwhile, the police responded to the girls' 911 call and found T.D.'s purse and driver's license at the trail.

Pollano shined his phone's flashlight on T.D.'s face, and said " '[o]h, fuck.' "  After a "few beats," she looked at him and said " 'hi' " — as she did during their relationship — "to remind him who I was and that he was hurting me."  When that did not work, she said " 'I miss you.' "  That appeared to "reach[] him," and she asked " '[c]an you hold my hand?' "  He did and told Urena to drive to her home.

Once they arrived, Pollano told her, " 'I didn't mean for this to be an abusive kind of thing.' " She realized that "appealing to whatever part of him responded to the hand holding" was helping her, so she continued to "lean into that." She responded, " 'I know — like, I know you wouldn't do that.' " He said, " 'I'm gonna have to pay for this.' " Once in the home, he took her to the attic and asked her not to call the police. She convinced him she should because her driver's license was near the trail. He agreed, but she told the police a fake story at his direction.

Pollano refused to leave, and T.D. noticed he was trying to "makeup." As a result, she felt safer and did not want to upset him. So, before Urena left, she walked to the car with Pollano rather than risking more violence. After Urena left, Pollano repeatedly apologized and kept saying he was sorry and loved her. He asked if there was anything he could do. She gently asked him to leave to avoid upsetting him. He refused and asked for a hug, and she responded, " 'I'll feel so much worse if I give you a hug right now. Please go.' " He "was almost gone," so she "dropped down on [her] knees" and begged him to go. He left, and she immediately locked the door.

After Pollano left, T.D. told her father what happened. He thought she looked "almost unrecognizable," and they went to the hospital. The police called twice, but she was too afraid to tell them what happened. The next day, she told them.

On October 17, 2023, the case went to trial. The jury convicted Pollano of kidnapping, making criminal threats, domestic violence, two counts of dissuading a witness, and assault with force likely to cause great bodily injury. It acquitted him of assault with a deadly weapon and a firearm but convicted him of assault — the lesser included offense for each count. It also

found that he did not use a firearm. The trial court sentenced him to seven years and four months in prison.

## DISCUSSION

Pollano argues the trial court erred by admitting the testimony of the domestic violence expert. Specifically, he contends the evidence was more prejudicial than probative because the expert only provided "a broad, generic theory" without linking it to Pollano and T.D. We disagree.

At the prosecutor's request, the trial court admitted the testimony of an expert — Richard Ferry — to dispel common misconceptions about domestic violence. It limited his testimony to "the cycle theory of violence, [coercion], and then the strategies employed by victims."

Ferry testified that the cycle of violence consists of tension building, acute violence, and loving contrition or remorse. In tension building, the individuals "are talking to each other either as little as possible or they're snapping at each other." If the victim has experienced the cycle before, "those events signal that something's coming and it's probably gonna be worse." And while some victims take "evasive maneuvers" like "talking less," others employ a "get this over with" strategy and "provok[e]" their abusers. Victims do so because the tension "becomes unbearable." In the acute violence phase, there is battering. It escalates over time and, once the abuser's behavior becomes more violent, they are more likely to return to it. After acute violence is "loving contrition or remorse." The victim experiences "shock and disbelief," and the abuser experiences "regret and remorse." The abuser apologizes, asks for forgiveness, and is kinder and more attentive, but "in the background" is the threat of violence. The remorse phase does not last, and the violence increases. Victims often appease their abuser rather than leave and may protect them from law enforcement.

5

Evidence Code section 1107 provides " 'expert testimony is admissible by either the prosecution or the defense regarding [intimate partner battering and its effects], including the nature and effect of physical, emotional, or mental abuse on beliefs, perceptions, or behavior of victims of domestic violence.' " (*People v. Brown* (2004) 33 Cal.4th 892, 900.)  The evidence "is relevant to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand." (*People v. Riggs* (2008) 44 Cal.4th 248, 293.)  Its relevance "is based on the possibility that the jurors will doubt that a witness who claims to have been abused has indeed acted in the manner to which he or she testified, and therefore the jurors might unjustifiably develop a negative view of the witness's credibility." (*Ibid.*)  "Even if the defendant never expressly contests the witness's credibility along these lines, there is nothing preventing the jury from ultimately finding in its deliberations that the witness was not credible, based on misconceptions that could have been dispelled" by the evidence.  (*Ibid.*)  We review the admission of such evidence for abuse of discretion.  (*Id.* at p. 294.)

The trial court did not abuse its discretion by admitting Ferry's testimony.  (*People v. Riggs*, *supra*, 44 Cal.4th at pp. 293–294.)  Contrary to Pollano's assertions, there was a link between the facts of the case and the testimony.  It explained why T.D. slapped him, why she told him " 'hi' " and that she missed him, and why she wanted to hold his hand.  It also explained why she tried to appease him by going to Urena's car rather than trying to escape and why she waited to go to the police.  Without the evidence, the jury might have mistakenly believed the only reasonable explanation for her behavior was that she exaggerated his crimes.  (*Ibid.*)

6

Next, Pollano argues the trial court violated his Sixth Amendment rights by denying him access to T.D.'s mental health records. We disagree.

In June 2022 — pursuant to Pollano's subpoena — the trial court ordered T.D.'s medical provider to produce her medical and psychiatric records to the court. In November, the court found that, "after balancing the privacy interests of the subject of the materials against the right of the defense to a fair trial, the subpoenaed materials should be disclosed to the defense." But it also concluded that the materials "are subject to *People v.* [*Hammon*] (1997) 15 Cal.4th 1117; and therefore, the materials are not subject to disclosure prior to trial." It then ordered "the subpoenaed materials remain in the custody of the subpoena clerk subject to the orders of the assigned trial judge if the case is sent to trial." By October 2023, the case was assigned to a different judge for trial.

On October 13, 2023 — four days before trial — the trial judge considered whether the records should be produced to the defense. The court reviewed the records and did not "see any relevance to these proceedings" but admitted it knew nothing about the case yet. It invited the defense to "submit a declaration under seal" or "go on the record in an in camera session and make a proffer as to the relevance of the materials." The defense declined to do so but argued the records could be relevant. The court reiterated that it had reviewed the records and did not find anything relevant. Pollano does not contend he renewed his request during the trial.

"When a defendant proposes to impeach a critical prosecution witness with privileged information, the trial court may be called upon to balance the defendant's rights under the Sixth Amendment to access such material at trial against the state policies supporting the privilege." (*People v. Nieves* (2021) 11 Cal.5th 404, 432.) But "[b]efore trial, the court typically will not

7

have sufficient information to conduct this inquiry." (*People v. Hammon* (1997) 15 Cal.4th 1117, 1127.) Thus, "if pretrial disclosure is permitted, a serious risk arises that privileged material will be disclosed unnecessarily." (*Ibid.*) Therefore, the "Sixth Amendment right to access protected information does not extend to *pretrial disclosure*, given the possibility that subsequent developments may eliminate the justification for invading a patient's statutory privilege." (*Nieves*, at p. 432, italics added.)

On this record, no error appears. (*People v. Nieves*, *supra*, 11 Cal.5th at p. 432.) Pollano made his request on October 13, four days before trial. Thus, he did not have a right to the records. (*Ibid.*) This case illustrates the reasoning supporting the rule. At the time he requested the records, the trial court admittedly knew nothing about the case. Trial had not started, and the court had not yet heard evidence. Indeed, the court invited in-camera declarations and statements explaining the relevance of the records. Defense counsel declined the invitation and instead speculated why they could be relevant. (*United States v. Agurs* (1976) 427 U.S. 97, 109–110 [mere possibility that information may have helped the defense does not establish " 'materiality' in the constitutional sense"].) The court thus did not have sufficient information to balance Pollano's Sixth Amendment right against T.D.'s right to privacy to avoid the unnecessary disclosure of privileged material. (*People v. Hammon*, *supra*, 15 Cal.4th at p. 1127; *People v. Stritzinger* (1983) 34 Cal.3d 505, 511 ["The psychotherapist-patient privilege has been recognized as an aspect of the patient's constitutional right to privacy"].) For example, had Pollano requested the records again after T.D.'s direct examination, the court may have been able to better weigh the competing rights. (*Hammon*, at p. 1127.) He failed to do so. In any event,

8

the records were four years old, and the record contains no indication why such records were likely to contain material relevant to her credibility.

Finally, we reject Pollano's claim that the alleged errors were cumulatively prejudicial. (*People v. Duff* (2014) 58 Cal.4th 527, 562.)

## DISPOSITION

The judgment is affirmed.

_____
RODRÍGUEZ, J.


WE CONCUR:


_____
FUJISAKI, Acting P. J.


_____
PETROU, J.


A170505; *People v. Pollano*