Filed 8/8/16  P. v. Topachikyan CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>AVAG TOPACHIKYAN,<br><br>   Defendant and Appellant. | D069939<br><br><br><br>(Super. Ct. No. RIF1303246) |

APPEAL from a judgment of the Superior Court of Riverside County, Michael B. Donner, Judge.  Affirmed.

Kaplan, Kenegos & Kadin and Jerry Kaplan for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Avag Topachikyan of multiple sexual crimes against his step-daughter (Jane Doe 1), and an additional sexual offense against his daughter (Jane Doe 2), both of whom were under 14 years old at the time of the assaults.  For his attacks on

Jane Doe 1, he was convicted of two counts of forcible oral copulation on a child under the age of 14 (Pen. Code,[1] § 269, subd. (a)(4), counts 1 & 2), two counts of forcible sexual penetration on a child under the age of 14 (§ 269, subd. (a)(5), counts 4 & 5) and five counts of forcible lewd acts on a child under the age of 14 (§ 288, subd. (b), counts 6-10). For his attack on Jane Doe 2, he was convicted of one count of a lewd act on a child under the age of 14 (§ 288, subd. (a), count 13). The jury also found true the allegation, under section 667.61, subdivisions (c) and (e)(4), that the qualifying crimes were committed against more than one victim. On appeal, Topachikyan contends the evidence was insufficient to support the guilty verdicts, and the trial court abused its discretion when it allowed a therapist to interpose a claim of privilege to a question posed to the therapist.

## I

## FACTS[2]

A. <u>Prosecution Evidence</u>

Jane Doe 1 was born in June 1999. Jane Doe 2 was born in July 2002. Topachikyan was married to the mother (Mother) of the two victims.

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

[2]    Where, as here, a defendant contends that substantial evidence does not support his conviction, we must "review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial* evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We state the facts in the light most favorable to the judgment.

In 2005, Jane Does 1 and 2 moved with Topachikyan and Mother to Lake Elsinore, when Jane Doe 1 was six or seven years old and in the first or second grade. The family later moved to Riverside when Jane Doe 1 was 12 or 13 years old, just before she entered the seventh grade. Most of the time, Topachikyan and Jane Doe 1 got along well, although he was more of a disciplinarian than Mother and would scold Jane Doe 1 using a loud voice, which scared her and made her feel anxious.

Mother first told Jane Doe 1 that Topachikyan was not her biological father when Jane Doe 1 was in the fourth grade. They talked about it again when she was in the seventh grade. Mother and Topachikyan asked Jane Doe 1 if she wanted Topachikyan to adopt her, and Jane Doe 1 "was open to it."

On May 16, 2013, Jane Doe 1 told Mother that Topachikyan had been touching her inappropriately. Topachikyan stopped living in the house with them that night, and Mother filed for divorce in July 2013.

*Molestations Occurring in Lake Elsinore*

The prosecution, in addition to evidence of uncharged offenses against Jane Doe 1 that began while the family lived in Lake Elsinore,[3] introduced Jane Doe 1's testimony

---

[3]    The first time Jane Doe 1 remembered being sexually abused by Topachikyan was when she was living in Lake Elsinore. On one occasion, after swimming in the public pool up the street from their house, Topachikyan noticed that Jane Doe 1 had gotten a sunburn. He insisted upon putting lotion on her. He had her lie down in his bed, moved her bathing suit out of the way, and began rubbing her vagina with his hand. On another occasion in the Lake Elsinore house, Topachikyan told her to take a shower and put on her robe. After she showered, he called her downstairs and told her to sit with him on the recliner in the living room. Topachikyan had just gotten out of the shower too and was

3

about the numerous charged offenses committed against her while they lived in Lake Elsinore. On one occasion in their Lake Elsinore house (count 1), Topachikyan and Jane Doe 1 were watching television on the recliner in their living room. She was wearing a robe and was sitting on Topachikyan's lap facing towards the television. Topachikyan picked her up and moved her so that she was lying on her side facing him. He then told her to reach over him and turn off the living room light. When she did so, he licked her vagina.

On a second occasion at the Lake Elsinore house (count 2), Jane Doe 1 and Topachikyan were on the couch when no one else was home. Topachikyan put a blanket over her head and told her to put his penis in her mouth and lick it like a lollipop. His penis was erect at the time. She did as she was told because she was afraid of him.

Either immediately after the act constituting count 1, or perhaps on an entirely different occasion but in the same living room, Topachikyan committed the offense charged in count 6. Topachikyan shifted her so she was sitting on his lap and facing him, and his penis was outside of his pants and between her legs, touching the outside of her vagina. He moved her around in a "grinding fashion" until his penis was positioned where he wanted it. He told her to look toward the television so she did not see what was happening.

When Jane Doe 1 was in the fifth grade, Topachikyan molested her in his truck (count 4). He was driving Jane Does 1 and 2 home from his parents' house in Los

---

wearing his robe. When she sat down next to him, Topachikyan began "playing" with her vagina. He then put his finger inside her.

4

Angeles. Jane Doe 1 was sitting in the front seat, and Jane Doe 2 was asleep in the backseat behind Jane Doe 1. Topachikyan unbuttoned Jane Doe 1's purple skinny jeans, had her pull them down "a bit," and stuck his hand inside. She had to listen to him when he told her to pull her pants down because otherwise she would get in trouble. First, he rubbed her vagina over her underwear. Then, he moved his hand under her underwear and started rubbing her vagina. While he was doing that, he said that she should not be wearing such tight jeans. She was happy "[h]e couldn't do it for very long because of the jeans."

On another occasion in Lake Elsinore (count 5), Topachikyan and Jane Doe 1 were driving home from dinner in his truck; her brother and sister were in another car with Mother. Again, Topachikyan stuck his hand in Jane Doe 1's pants and touched her on top of her underwear. He then put his hand underneath her underwear and moved his fingers in and out of her vagina. This was the first time he put multiple fingers inside her, and it hurt "a little bit." When they drove past their house, he asked her, "Do you want me to keep going?" She said, "Sure," even though she did not, because she did not want to upset him and was afraid of him. At some point, they got stuck in a ditch, and after Topachikyan got the truck out of the ditch, he told her "[D]on't tell mom." Previously, he had told her not to tell anyone about the molestations because it was their "special little secret."

On another occasion at the house in Lake Elsinore (count 8), Topachikyan was playing Call of Duty on his PlayStation, and Jane Doe 1 was in her pajamas on the couch.

5

Topachikyan reached inside her pajamas and underwear and put his finger inside her vagina while his game was loading. He stopped when his game began.

On another occasion at the house in Lake Elsinore (count 9), Topachikyan called Jane Doe 1 into his bedroom and then signaled for her to come into his closet. Once inside the closet, he inserted a vibrator inside her vagina for a few seconds. Topachikyan asked her if that felt good. She did not remember what she said, but remembered feeling "[w]eird and unnatural."

*Molestations Occurring in Riverside*

The prosecution, in addition to evidence of uncharged inappropriate touchings that occurred after the family moved to Riverside, introduced Jane Doe 1's testimony about the offenses committed against her after the family moved to Riverside. On one occasion (count 7) in Riverside, Topachikyan made Jane Doe 1 rub his penis while he was in his recliner. He said, "hey, try this," as he took her hand, made a circle with her fingers, and moved her hand up and down. His penis was erect at the time. On the last occasion (count 10), which occurred when she was 11 or 12 years old, she and Topachikyan were in her room. He again stuck his finger inside her vagina. She thought this may have been the same incident when Topachikyan took her shirt off, touched her breasts, and took a picture of her breasts with his phone. Jane Doe 1 explained that she knew what he was doing was wrong, but she was too scared to say "no." However, when Topachikyan tried to molest her the next time, she told him that she wanted the abuse to stop. He said, "Okay," and never did it again.

6

Topachikyan touched Jane Doe 2 inappropriately (count 13) when she was in the fourth grade. She and Topachikyan were alone in the pool in their backyard in Riverside, although Mother was home inside the house. Topachikyan told her to swim over to where he was leaning against the wall, in the shallow end, and had her sit on his lap. At first, she was facing away from him, but he turned her around to face him. When he did so, his thumb was on her back and the rest of his hand was on her chest, and he kept his hands on her chest for a "little bit." At some point, she noticed that Topachikyan's penis, which was erect and either sticking out of the hole in the front of his swim trunks or out of the top, was touching her thigh and private area. When she swam away, Topachikyan "poked" his penis back in his trunks.

*Mother Learns of Molestations*

On May 16, 2013, Jane Doe 1 approached Mother and said there was something important she wanted to talk about with her and Topachikyan. Jane Doe 1 appeared nervous, and Mother suggested Jane Doe 1 tell her what was wrong first, and they could talk with Topachikyan about it later. Jane Doe 1 agreed, but said that she did not want to talk about it in front of Jane Doe 2 or her little brother. Jane Doe 2 then asked, "[T]his isn't about that thing that could break up the family?" Mother sent Jane Doe 2 and her brother to their bedrooms, and then and sat down with Jane Doe 1 and asked if something happened to her. Jane Doe 1 nodded and started to cry, and Mother then asked if someone did something to her. Jane Doe 1 nodded and Mother asked if someone had touched her. Jane Doe 1 again nodded and, by that point, was sobbing. Mother asked if someone in their family touched her, and Jane Doe 1 again nodded. Mother told her that

7

she needed to tell Mother who the person was, and explained that she could not do anything unless she knew.  Jane Doe 1 shook her head, and Mother then asked if it was someone who lived in their house, and Jane Doe 1 responded by nodding.  Mother then asked, "[A]re you telling me that your dad has touched you?" and Jane Doe 1 said he had and cried even more.

When Mother asked for details, Jane Doe 1 did not want to provide them, explaining she felt as though it was her fault because she allowed it to continue for so long. Topachikyan stopped living in the house with them that night, and Mother reported the crimes to the Riverside Police Department.

*Other Evidence*

When Jane Doe 2 was initially asked by a police officer and someone from CPS whether anyone had ever touched her inappropriately, she lied and said they had not.  In fact, Jane Doe 2 tried to convince herself that what happened with her father was an accident in order to make herself feel better.  However, when they were living in Las Vegas, Jane Doe 2 texted a suicide hotline so she could get what happened off her chest, and the person on the hotline told her to tell Mother.  Thereafter Jane Doe 2 wrote Mother a note telling her what Topachikyan had done and slipped it under Mother's bedroom door.  The note read:

> "I never told anyone this except for a suicide hotline.  He put his thing in between my legs in the pool in 4th grade.  I tried to swim away, but he yelled at me to come back.  I never said because I thought it would be too late, and you wouldn't believe me when I felt like saying it.  I wish my make up was water proof.  When you asked me if I've been touched, I lied through my teeth."

8

Jane Doe 2 explained she wrote the note instead of telling Mother in person because she was afraid to see Mother's reaction. Mother went into Jane Doe 2's room with the note in hand and asked who she was talking about, and Jane Doe 2 then handed Mother a picture of Topachikyan. Mother and Jane Doe 2 met with investigators in Las Vegas, and Jane Doe 2 revealed that when she was sitting on Topachikyan's lap and his penis was out, Topachikyan moved his body around.

Melissa Merejil, Jane Doe 1's youth leader at church, testified that in May 2013, Jane Doe 1 called her on the telephone crying and said she did not want to "mess her family up" and was not sure what she should do. However, Jane Doe 1 refused to explain exactly what she was talking about. Merejil told Jane Doe 1 that she should talk to Mother about whatever was bothering her. On July 14, 2013, Jane Doe 1 filled out a "communication card" at her church on which she wrote, "My parents are going through a divorce, and I thought I was over it because he made a—he made a mistake and I told on him. And I feel as if it was my fault, but I'm not over it. Help." She filled out another "communication card" on July 21, 2013, on which she wrote, "I forgive my dad, and for my mom." She explained she was asking for prayers to help her forgive her father for molesting her and for prayers for Mother.

In January 2014, Riverside Police Detective Flores examined a Samsung Galaxy S3 looking for text messages to a crisis hotline and found six such texts, which had previously been deleted. Mother had called a detective to tell her about Jane Doe 2's accusations on December 14, 2013, the same day the telephone records show the texts to the crisis hotline.

9

*Defense Case*

Topachikyan testified on his own behalf and denied ever molesting his daughters. (2 RT 480-485, 496-497.) He explained that he had owned an iPhone 3Gs, an iPhone 4, and a Samsung 3Gs. He gave the iPhone, which was searched by the police, to Mother when they lived in the Riverside house, after he bought the Samsung. He denied that he took a picture of Jane Doe 1's breasts with his phone.

II

ANALYSIS

A. The Substantial Evidence Challenge

Topachikyan contends the evidence is insufficient to support his convictions. He asserts (1) Jane Doe 2's testimony was not credible due to various inconsistencies; (2) Jane Doe 2's testimony did not establish he had the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or Jane Doe 2 when he touched her in the pool; (3) Jane Doe 1's testimony was not credible because she had an animus toward Topachikyan and her testimony contained some inconsistencies; and (4) there was no evidence corroborating Jane Doe 1's description of the events because neither the vibrator nor the photographs were found.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1,

10

27.) Our inquiry on appeal in light of the whole record is whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Osband* (1996) 13 Cal.4th 622, 690.)

As a preliminary matter, Topachikyan has waived his claim of insufficiency of the evidence, because his brief recites only a few snippets of the evidence, all of which are the most favorable to his view of the evidence, and ignores the evidence supporting the verdict. (*People v. Battle* (2011) 198 Cal.App.4th 50, 62; *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282 [where "contentions are bereft of factual underpinning, record references, argument, and/or authority," claims are waived].)

Even assuming the issue was not waived, the testimony of the victims provided ample evidence to support the verdicts. It is the exclusive province of the jury to determine the credibility of the witnesses and resolve conflicts or inconsistencies in their testimony. "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment . . . ." (*People v. Maury* (2003) 30 Cal.4th 342, 403; Evid. Code, § 312.) The reasons for any inconsistencies may be explored by both the prosecutor and defense counsel and it is for the jury to decide which statements are true and which statements are false. (See *People v. Cuevas* (1995) 12 Cal.4th 252, 273; *People v. Jones* (1990) 51 Cal.3d 294, 314.) Before an appellate court may reject the statements given by a witness at trial who the jury has chosen to credit, " ' "there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions" [(quoting *People v. Huston* (1943) 21 Cal.2d 690, 693)], [and] [s]uch cases are rare indeed.' " (*People v. Ennis* (2010) 190

11

Cal.App.4th 721, 728-729.) The jury's verdicts demonstrated they credited the testimony of Jane Does 1 and 2, and this is not the rare case that would permit us to ignore that determination, because there is nothing either physically impossible or patently false in any of the testimony given by either victim. We conclude Topachikyan's claim concerning the sufficiency of the evidence lacks merit.

B. <u>The Evidentiary Claim</u>

Topachikyan also asserts the court abused its discretion when it permitted a witness, Ms. Norris, to claim the psychotherapist/patient privilege and refuse to answer defense counsel's question about whether she made a report to CPS after meeting with Jane Doe 1.

*Background*

Outside the presence of the jury, defense counsel stated his intent to have Norris testify: (1) she was a therapist who met with Jane Doe 1 eight times; (2) Norris was a mandatory reporter who was required by law to report suspected sexual abuse; and (3) she did not file a report with CPS after her sessions with Jane Doe 1. Defense counsel argued Norris's testimony suggested Jane Doe 1 never told Norris about the abuse, which in turn supported an inference the abuse never happened. The prosecutor argued the proffered testimony should be excluded, but the trial court agreed to admit Norris's testimony.

When Norris took the stand, she testified she was a marriage/family therapist and a mandatory reporter, which meant she was required by law to report any reasonable suspicion of child abuse, including sexual molestation. Norris further explained Jane Doe

12

1 came to her for eight to 10 counseling sessions a couple years earlier. Defense counsel then asked whether Norris made any reports to CPS after meeting with Jane Doe 1, and Norris stated that she wished to assert the therapist/patient privilege on behalf of Jane Doe 1. When defense counsel asked the question again, the court responded, "She just asserted that privilege to her—that very question. Her privilege." Defense counsel asked to approach the bench, but the court said, "No."

*Analysis*

Evidence Code section 1014 provides that confidential communications between a patient and his or her psychotherapist are privileged and not subject to disclosure provided the privilege is claimed by the patient, someone the patient authorizes to claim the privilege, or the psychotherapist. The psychotherapist is required to assert the privilege on the patient's behalf if present when the communication is sought to be disclosed. (Evid. Code, § 1015.) Confidential communications are defined as "information . . . transmitted between a patient and his psychotherapist in the course of that relationship and in confidence . . . ." (Evid. Code, § 1012.) The psychotherapist-patient privilege must be broadly construed in favor of the patient, while exceptions to the privilege must be narrowly construed. (*People v. Stritzinger* (1983) 34 Cal.3d 505, 511, 513.)

Topachikyan argues the question asked of Norris did not call for privileged information because Evidence Code section 1026 provides: "There is no privilege under this article as to information that the psychotherapist or the patient is required to report . . . ." However, this argument ignores that this section provides in full that,

13

"There is no privilege under this article as to information that the psychotherapist or the patient is required to report to a public employee or as to information required to be recorded in a public office, *if such report or record is open to public inspection*." (Evid. Code, § 1026, italics added.) Topachikyan presents no argument on appeal, and made no proffer below, that a mandatory reporter's report to CPS would qualify as a "report . . . open to public inspection" to which an exception to the privilege was applicable, and it appears the law is generally to the contrary. (See generally § 11167.5, subd. (a) ["The reports required by Sections 11166 and 11166.2, or authorized by Section 11166.05 . . . shall be confidential and may be disclosed only as provided in subdivision (b)."].)

However, even assuming the trial court erred in upholding Norris's claim of privilege, and thereby prevented the jury from drawing an inference (from the fact Norris did not file a report with CPS after meeting with Jane Doe 1) that Jane Doe 1 did not tell Norris of Topachikyan's assaults, we are convinced such error was harmless under the standard of prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, the test we apply for the erroneous exclusion of evidence. (See. e.g., *People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) Under *Watson*, an error is harmless unless it is reasonably probable that a result more favorable to the defendant would have been reached had the evidence been admitted. (*Fudge*, at p. 1104.) Here, the jury heard testimony that Jane Doe 1 saw a counselor for therapy at the beginning of seventh grade, shortly after moving to Riverside, and also heard testimony that the first time Jane Doe 1 ever told *anyone* about the abuse was years later when she spoke with Mother about it on May 20, 2013. Thus, the jury was necessarily aware of the fact that Jane Doe 1 did not disclose the abuse to

14

anyone (including Norris) prior to May 20, 2013.[4]  Because the jury already knew Jane Doe 1 did not disclose the abuse to Norris, it is not reasonably probable that the result of the trial would have been any different even had Norris specifically testified she did not file a report with CPS after meeting with Jane Doe 1.

## DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

NARES, Acting P. J.

O'ROURKE, J.

---

[4]     During closing argument, defense counsel specifically argued this point even though Norris's testimony on the matter had been excluded, arguing: "So what happens next?  Sends her to that mandatory reporter.  And there's no reports made because she admits she never tells them about any sexual abuse that's been going on for years and then quit.  And it's going to be approximately a year and a half before at the Riverside address, and there's absolutely no report made to anybody . . . ."