Filed 11/3/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAYMUNDO GOMEZ,<br><br>    Defendant and Appellant. | D083403<br><br><br><br>(Super. Ct. No. SCD299373) |


APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Reversed and remanded.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Joy Utomi and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

This case puts into tension two undeniably important rights: a parent's right to protect their child's emotional wellbeing and a criminal defendant's constitutional right to confront the witnesses against him. Raymundo Gomez was accused of committing multiple lewd acts against children he contacted in a public swimming pool. One of the victims, an eight-year-old girl named Katrina G., described the abuse in a forensic interview and a subsequent preliminary hearing. When it came time for her to testify at trial, however, her mother (Mother) objected to bringing her to court. In a hearing before the trial court, Mother testified that she did not want to subject Katrina to the proceedings any longer, as she believed the courtroom environment was not appropriate for her child. The court ultimately found Katrina unavailable to testify and allowed her prior statements to be presented to the jury instead.

Convicted by jury of committing two lewd act offenses against Katrina, and a third against another child, Gomez contends the trial court erred in finding Katrina unavailable and admitting her prior statements, thereby violating his constitutional rights to confrontation and due process. As we explain, although a parent's decision not to permit their child to testify might in some instances support a finding of the child's unavailability, the record in this case falls short of demonstrating Mother was steadfast in her refusal to bring Katrina to court. Accordingly, we disagree with the unavailability determination here. Finding the error prejudicial as to all three lewd act offenses under the applicable standard, we reverse the judgment as to those counts and remand to the trial court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

One weekend in June 2023, 14-year-old Kane F. visited Campland on The Bay (Campland), a waterfront campground with pools, hot tubs, parks, and other recreational activities for families. Kane and his friend were

2

taking turns swimming laps in the pool when he noticed Gomez, wearing a tank top and "boxers underwear," enter the pool. Kane told his friend, " 'Man, this guy looks like a creep.' " When his friend swam to the other side of the pool, Gomez approached Kane and asked his name and where he was from. Thinking this was weird, Kane gave fake answers. Gomez then followed Kane to another area of the pool. Gomez reached out to shake Kane's hand, saying it was nice to meet him. Not wanting to aggravate Gomez, Kane obliged. Gomez then pulled Kane's hand down and placed the back of it against his genitals, outside of his boxers. Kane quickly pulled his hand back and left the pool.

Soon thereafter, Gomez approached eight-year-old Katrina, who was in the pool with her brothers while her mother and stepfather were in the hot tub. Gomez swam up to her, told her, "Don't drown," and squeezed her butt. Afraid that Gomez was going to "kidnap [her]," Katrina swam behind one of her brothers. Some time later, Katrina's stepfather joined the children in the pool. Gomez approached again and touched Katrina on her hip.[1]

Meanwhile, Kane told Campland security what had happened and, later that same night, reported the incident to the police. The police contacted Gomez on a bike path leading away from Campland. Kane identified Gomez in a curbside showup. Police later reviewed surveillance video of the pool area, which showed Gomez interacting with Kane and Katrina.

---

[1] The summary of the offenses against Katrina is taken from her preliminary hearing testimony, as it was read to the jury at trial. The jury also watched a video of a forensic interview conducted at a local Child Advocacy Center, in which Katrina gave a similar account of the events.

The prosecution charged Gomez with one count of committing a lewd act upon a child 14 or 15 years of age (bringing Kane's hand to Gomez's penis) (Pen. Code,[2] § 288, subd. (c)(1); count 1), three counts of committing a lewd act upon a child under 14 years of age (touching Katrina's buttocks and hip area with his hand, and touching a third child's legs with his feet[3]) (§ 288, subd. (a); counts 2 through 4), and one count of failing to register as a sex offender (§ 290.018, subd. (b); count 5). As to each count of committing a lewd act upon a child under the age of 14, the prosecution further alleged the multiple-victim circumstance pursuant to the One Strike law (§ 667.61, subds. (b), (c), & (e)). Two aggravating sentencing factors were asserted as well (Cal. Rules of Court, rule 4.421(b)(2) & (3)).

A jury convicted Gomez of the offenses against Kane and Katrina (counts 1 through 3), but found him not guilty of the offense against the third child (count 4) and found the multiple-victim circumstance not true. In bifurcated proceedings, Gomez pleaded guilty to failing to register (count 5) and the court found true both aggravating sentencing factors.

The court sentenced Gomez to a total determinate term of 11 years, four months in state prison, comprised of the upper term of eight years for one lewd act offense against Katrina (count 2) plus three consecutive terms of eight months for the remaining offenses (counts 1, 3, and 5).[4]

---

[2] Further undesignated statutory references are to the Penal Code.

[3] The prosecution presented evidence that before encountering Kane and Katrina, Gomez used his feet to touch the legs of a 13-year-old girl in a hot tub.

[4] These terms do not equal 11 years, four months. It appears the trial court erred in imposing eight months on count 3, as one-third the midterm for a section 288, subdivision (a) offense is two years. But since we are reversing the judgment in this case, Gomez will eventually be resentenced.

## DISCUSSION

Gomez maintains the trial court violated his Sixth Amendment right to confront and cross-examine adverse witnesses as well as his Fourteenth Amendment right to due process when it admitted Katrina's preliminary hearing testimony and forensic interview after finding her unavailable.

### A. *Additional Background*

Testimony began on October 25, 2023. At the end of that day, after several witnesses had testified, the prosecutor alerted the trial court that Katrina's mother (Mother) had "become uncooperative" and no longer wanted to bring Katrina to court. The prosecutor explained that Katrina testified at the preliminary hearing and the district attorney's (DA) office had maintained contact with Mother ever since. Mother received a subpoena for trial,[5] understood she was supposed to bring Katrina to court to testify the following day, and was initially amenable to doing so. But when the DA investigator called Mother that afternoon to confirm Katrina would testify first thing in the morning, Mother was suddenly "adamant" that she would not bring Katrina "despite any accommodations that we were willing to offer." A paralegal in the office also contacted Mother, and she "reiterated the same thing about no longer coming." Mother indicated that she did not like Katrina testifying previously, she felt Katrina no longer remembered the

---

[5] Under section 1328, subdivision (b)(1), if service of a subpoena is to be made on a minor under 12 years of age, "service shall be made on the minor's parent, guardian, conservator, or similar fiduciary . . . . The person served shall have the obligation of producing the minor at the time and place designated in the subpoena. A willful failure to produce the minor is punishable as a contempt pursuant to Section 1218 of the Code of Civil Procedure."

incident, and she did not want to bring Katrina to court because it was traumatic for her daughter.

Given the circumstances, the prosecutor asked the court to declare Katrina unavailable and allow her preliminary hearing testimony to be read and her forensic interview to be played for the jury. In response, defense counsel directed the court to Evidence Code section 240, subdivision (a)(5), which states that a witness may be deemed unavailable when they are "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." Counsel accordingly requested "statements or an affidavit as to what efforts" the prosecution had made to secure Katrina's presence. The prosecutor reiterated that Mother was subpoenaed. "She was aware, she was initially inclined to come to court but then changed and now is no longer coming. And there's no other acts that produce the witness for trial [*sic*]. Certainly, the People cannot be required to otherwise produce an eight-year-old child in court if her parent is not bringing her."

The court was "really concerned"—noting this was "a very serious 15-to-life" case against Gomez—and requested to hear an explanation from Mother directly, to ensure she had a legitimate reason for refusing to bring Katrina to court. The prosecutor confirmed that Mother was willing to come to court in the morning to speak to the judge. Defense counsel asked "if we could perhaps do it over the phone right now" instead, so he could research the issue that night with Mother's explanation in mind. The prosecutor agreed.

6

At the outset of the phone call, the court placed Mother under oath and apologized for "put[ting] [her] through this," but emphasized the importance of the issue given the seriousness of the case. The court first asked whether Katrina exhibited any signs of trauma—such as problems sleeping—after the forensic interview or preliminary hearing. Mother said, "No, but she said she doesn't want to talk about that anymore" and "she doesn't remember." The court clarified: "And as a result of her just saying she doesn't want to talk about it, that's why you're not bringing her in?" Mother replied: "I can't force her to the car and . . . drag her to . . . the court. She doesn't want to go." When the court asked whether Mother believed Katrina would physically refuse to get in the car, Mother said she did not know and did not want to try.

Mother went on to explain that Katrina did not want to discuss the incident "especially the way how it was [in] the previous court" (i.e., the preliminary hearing), which Mother described as unpleasant and inappropriate for a child given the number of people present, the questions asked, and the perceived rudeness of the previous judge. Katrina had "problem feelings about that" and Mother did not "want to put her through this again."

The court apologized to the extent the previous judge was rude. It expressed its intention "to make the courtroom as comfortable as possible" for Katrina. To that end, the court offered to have a service dog sit beside Katrina during her testimony, to have Mother present in the courtroom as a support person, and to move the witness podium so that Katrina would not have to look at Gomez. The court asked whether Katrina would feel comfortable testifying with all of those accommodations in place. Mother responded: "I don't know. I mean it's – I understand there are a lot of people there, right, like a jury?" The court confirmed there would be 14 jurors in the

7

courtroom. Mother expressed that she did not feel it was good for Katrina to discuss the incident in front of several strangers. She was "afraid this whole ordeal will traumatize her more than the" incident itself and she did not "want to put her through this."

At the prosecutor's request, the court confirmed with Mother that she received the subpoena to bring Katrina to court. Defense counsel did not have any additional questions for Mother.

After ending the call, the court told counsel it was inclined to find Katrina unavailable given Mother's statement under oath that testifying at trial would traumatize Katrina. It invited counsel to research the issue and provide additional argument in the morning. At that time, defense counsel posited there was no reason to believe Katrina would be traumatized since there were no signs of trauma after the forensic interview or preliminary hearing. He asserted that simply refusing to testify did not justify an unavailability finding. To that point, the prosecutor maintained that the court did not need to find Katrina suffered trauma in order to deem her unavailable under Evidence Code section 240, subdivision (a)(5); it only needed to find that the prosecution exercised due diligence in securing her testimony, which it had. As the court understood the conversation, Mother believed that Katrina would be traumatized—not because she lost sleep, had nightmares, or cried after her prior statements—but because of how she was treated during the preliminary hearing and because it is generally "very traumatizing for a young child of that age to come into a courtroom with 20-some strangers in the courtroom and provide testimony." The court also highlighted that Mother was "adamant" she would not bring Katrina despite the accommodations offered.

8

By morning, the prosecutor filed a written motion to admit Katrina's prior statements. She maintained that Katrina was unavailable under Evidence Code section 240, subdivision (a)(5) because the prosecution was unable to procure her live testimony despite reasonable diligence. Their efforts included maintaining contact with Mother for months leading up to trial, serving her with a subpoena to bring Katrina to trial, keeping her apprised of trial scheduling, and arranging to have a service dog available for Katrina. Mother never indicated she would not bring Katrina to court until the day before Katrina was due to testify. In support of the motion, the DA investigator submitted a declaration confirming that he spoke with Mother by phone. Mother stated she would not bring Katrina to court "because [she] felt her daughter already provided enough information"; "the investigation and court process was too traumatic to her daughter, causing her daughter to now claim she did not remember the events"; and "she would not allow her daughter to be subjected to any more events causing her to be traumatized."

Back in court, before the jury arrived, defense counsel stated he was unable to find a published case with similar facts addressing the issue at hand. But he now believed the applicable provision was Evidence Code section 240, subdivision (a)(3)—under which a declarant who is "unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity" may be deemed unavailable. Counsel contended this provision was not satisfied because the prosecution had failed to present expert testimony regarding Katrina's mental condition (see *id*., subd. (c)). The prosecutor submitted that subdivisions (a)(3) and (a)(5) of Evidence Code section 240 were alternative grounds for the court to find unavailability, and she was relying on (a)(5), which only required the court to find the prosecution exercised due diligence in attempting to procure Katrina's

9

testimony. In response, defense counsel suggested that subdivision (a)(5) did not apply because Mother and Katrina were not missing.

The court expressed great discomfort with the situation. On one hand, it believed "the DA's office has done everything in its power to get this child here in court" and it could not simply issue a material witness warrant since Katrina was a child and the victim of a sexual offense. On the other hand, the defense was entitled to have the jury hear that Katrina had purportedly forgotten the entire incident. The court also acknowledged that, the day prior, it "was fixated on the trauma to the child" and its tentative findings were based on Mother's "representation that her child would suffer trauma if she testified," which could reasonably fall under Evidence Code section 240, subdivision (a)(3). At the same time, defense counsel had not furnished any authorities suggesting that subdivision (a)(5) could not apply to the situation before it.

Ultimately, the court found "under 240(a)(5) that the district attorney has exercised reasonable diligence to secure Katrina's testimony; has subpoenaed her mother; has been in good contact with the mother; and that it is through no-fault of the DA's office that yesterday the mother just decided she was refusing to bring Katrina to court for the reasons that are on the record." Its admission of Katrina's prior statements, however, was conditioned upon a stipulation being read to the jury explaining the situation. Subject to the defense's objection on unavailability, counsel agreed to the following stipulation, which was read to the jury before the preliminary hearing testimony and forensic interview were presented:

> "Witness Katrina. Her mother has indicated to the Court that she is refusing to bring Katrina to court. She does not want Katrina to be subject to the court process any longer. Her mother indicates that Katrina now says that she has no memory of the specifics of this incident on June 9, 2023."

10

The court instructed the jury "to regard those facts as having been conclusively proved."

## B.    *Legal Principles Regarding Unavailability*

"It is axiomatic that a criminal defendant has a fundamental right to confront the witnesses against him.  (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; Pen. Code, § 686.)  It is equally well settled that the right of cross-examination is the primary interest secured by the confrontation guarantee and an essential safeguard of a fair trial."  (*People v. Brock* (1985) 38 Cal.3d 180, 188–189.)  Accordingly, "to deprive an accused of the right to cross-examine the witnesses against him is [also] a denial of the Fourteenth Amendment's guarantee of due process of law."  (*Pointer v. Texas* (1965) 380 U.S. 400, 405.)  "Although important, the constitutional right of confrontation is not absolute."  (*People v. Herrera* (2010) 49 Cal.4th 613, 621 (*Herrera*).)  "[T]here has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant."  (*Barber v. Page* (1968) 390 U.S. 719, 722 (*Barber*); accord, *Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*).)

This exception is codified in Evidence Code section 1291, subdivision (a)(2), which provides that "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and [¶] . . . [¶] [t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."  Accordingly, "when the requirements of [Evidence Code] section 1291 are met, the admission of

11

former testimony in evidence does not violate a defendant's constitutional right of confrontation." (*Hererra, supra*, 49 Cal.4th at p. 621.)

Here, the parties do not dispute that Katrina's statements during the preliminary hearing and forensic interview were testimonial. (See *Crawford, supra*, 541 U.S. at p. 68 [the term " 'testimonial' . . . applies at a minimum to prior testimony at a preliminary hearing"]; *People v. Sisavath* (2004) 118 Cal.App.4th 1396, 1400–1403 [child's statements in forensic interview may be testimonial].) At issue is whether she was unavailable.

"The fundamental purpose of the unavailability requirement is to ensure that prior testimony is substituted for live testimony, the generally preferred form of evidence, only when necessary." (*People v. Reed* (1996) 13 Cal.4th 217, 225 (*Reed*).) A witness is not " 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial." (*Hererra, supra*, 49 Cal.4th at p. 622, quoting *Barber, supra*, 390 U.S. at pp. 724–725.) "The United States Supreme Court has described the good-faith requirement this way: 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness. [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." ' " (*Hererra*, at p. 622, quoting *Ohio v. Roberts* (1980) 448 U.S. 56, 74.)

Our state Evidence Code—specifically, section 240—includes a nonexhaustive list of circumstances under which a witness may be deemed unavailable. (*People v. Smith* (2003) 30 Cal.4th 581, 623–624 (*Smith*).) Two enumerated categories of unavailability were discussed in the proceedings below. As noted, under Evidence Code section 240, subdivision (a)(3), an unavailable witness includes one who is "unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity." To establish unavailability under this subdivision, the illness or infirmity must be so severe that it is relatively impossible, and not merely inconvenient, for the witness to testify. (*People v. Stritzinger* (1983) 34 Cal.3d 505, 517–518 (*Stritzinger*).) "In the context of mental illness or infirmity, the phrase 'relatively impossible' . . . includes the relative impossibility of eliciting testimony without risk of inflicting substantial trauma on the witness." (*People v. Winslow* (2004) 123 Cal.App.4th 464, 471–472 (*Winslow*).)

While the statute does not specifically require expert testimony on this point, the Supreme Court has determined that expert testimony is generally necessary to demonstrate "the likely effect of the court appearance on the physical or mental health of the witness." (*Stritzinger*, *supra*, 34 Cal.3d at p. 518; see also Evid. Code, § 240, subd. (c) ["Expert testimony that establishes that physical or mental trauma resulting from an alleged crime has caused harm to a witness of sufficient severity that the witness is physically unable to testify or is unable to testify without suffering substantial trauma may constitute a sufficient showing of unavailability pursuant to paragraph (3) of subdivision (a)"].) Alternatively, the trial court may properly find that a witness's mental infirmity renders it relatively impossible for them to testify if the witness appears before the court in person, allowing the court to directly observe the witness's demeanor.

13

(*Stritzinger*, at pp. 517–519, citing *People v. Rojas* (1975) 15 Cal.3d 540, 547–551 [witness advised the trial court that he would not testify because he feared for his life and that of his family].)

In addition, under Evidence Code section 240, subdivision (a)(5), a witness who is "[a]bsent from the hearing" may be deemed unavailable where "the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." This provision is often invoked in cases where the witness is missing and/or residing outside of California. (See, e.g., *Hererra*, *supra*, 49 Cal.4th at p. 623–629 [witness deported to El Salvador]; *People v. Cogswell* (2010) 48 Cal.4th 467, 477–479 [victim returned to Colorado] (*Cogswell*); *Smith*, *supra*, 30 Cal.4th at pp. 608–611 [witness returned to Japan]; *People v. Ayala* (2024) 101 Cal.App.5th 62, 64–65 [transient witness could not be found before trial].) Factors relevant to evaluate reasonable diligence—also referred to as due diligence in the case law—" 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' " (*Hererra*, at p. 622.)

In their briefs, the parties discuss another category of unavailability developed by caselaw. When a witness is physically present in court but refuses to testify, the trial court may find the witness unavailable " 'only after taking reasonable steps to induce the witness to testify unless it is obvious that such steps would be unavailing.' " (*Smith*, *supra*, 30 Cal.4th at p. 624.) In these cases, reasonable efforts typically include some combination of questioning the witness under oath as to the reasons for their refusal; an express order to answer questions; and a determination as to whether additional time or a finding of contempt would change the witness's mind. (See, e.g., *ibid*.; *People v. Lawson* (2020) 52 Cal.App.5th 1121, 1126–1127,

14

1129 (*Lawson*); *People v. Francis* (1988) 200 Cal.App.3d 579, 585, 587; *People v. Walker* (1983) 145 Cal.App.3d 886, 891–894.) At the same time, "[t]rial courts 'do not have to take extreme actions before making a finding of unavailability.' " (*Smith*, at p. 624; see, e.g., *Lawson*, at pp. 1129–1130 [where victim confirmed that a finding of contempt and $1,000 fine would not persuade her to testify, the trial court was not required to actually take such action before finding her unavailable].)[6]

"When a witness . . . has been the victim of sexual assault, the determination of reasonableness must take into account the import of Code of Civil Procedure section 1219, subdivision (b)" (*Lawson, supra,* 52 Cal.App.5th at p. 1128), which prohibits a court from jailing such witnesses for contempt based on their refusal to testify concerning the sexual assault. The purpose of this provision " 'is not only to protect victims of sexual assault from further victimization resulting from imprisonment or threats of imprisonment by our judicial system, but also to begin to create a supportive environment in which more victims might come forward to report and prosecute [perpetrators of] sexual assault.' " (*Cogswell, supra,* 48 Cal.4th at p. 478.)

In any case, the proponent of the evidence has the burden of showing by a preponderance of competent evidence that the witness is unavailable. (*Smith, supra,* 30 Cal.4th at p. 609; *Winslow, supra,* 123 Cal.App.4th at p. 471.) We review the trial court's resolution of disputed factual issues for

---

[6]     In 2010, subdivision (a)(6) was added to Evidence Code section 240. (Stats. 2010, ch. 537, § 1.) This provision states that a witness who is "[p]ersistent in refusing to testify concerning the subject matter of the declarant's statement despite having been found in contempt for refusal to testify" may be found unavailable. The *Lawson* court held that this amendment did not necessarily require a trial court to find a witness who was refusing to testify in contempt before it could deem the witness unavailable. (*Lawson, supra,* 52 Cal.App.5th at pp. 1130–1131.)

substantial evidence and independently determine whether the facts establish the witness's unavailability. (*Herrera, supra*, 49 Cal.4th at p. 623.)

**C.      *The Prosecution Failed To Establish Katrina's Unavailability***

Covering all bases, Gomez contends the prosecution failed to demonstrate that Katrina was unavailable under any of the foregoing standards. Applying our independent judgment to the record here, we agree.

The question of whether the prosecution established Katrina's unavailability within the meaning of Evidence Code section 240, subdivision (a)(3) need not detain us long. While the trial court believed that Mother felt Katrina would be traumatized if she were to testify at trial—a credibility finding we do not second guess on appeal—the record is devoid of evidence, from either an expert or Katrina herself, suggesting that testifying would cause her *substantial* trauma such that it was relatively impossible for her to testify. (Compare, e.g., *People v. Christensen* (2014) 229 Cal.App.4th 781, 791–795 [physician and therapist of child with Asperger's syndrome opined that testifying would result in severe and long-lasting regression in emotional health],*Winslow, supra*, 123 Cal.App.4th at pp. 469–470, 473 [psychiatrist of child with posttraumatic stress disorder and developmental disabilities opined he would suffer a setback in his recovery if he were to testify] with *Stritzinger, supra*, 34 Cal.3d at pp. 516–518 [mother's testimony describing daughter's emotional state was insufficient as a matter of law to establish the effect that testifying would have on the daughter's mental health], *People v. Williams* (1979) 93 Cal.App.3d 40, 49–50, 54 [evidence showing that witness would suffer temporary mental anguish from testifying was insufficient to establish unavailability].) The Attorney General expressly denies that Evidence Code section 240, subdivision (a)(3) applies here.

16

Whether the prosecution exercised good faith and reasonable diligence in attempting to procure Katrina's testimony within the meaning of Evidence Code section 240, subdivision (a)(5) and the constitutional standard (see *Herrera*, *supra*, 49 Cal.4th at p. 622 ["In this regard, 'California law and federal constitutional requirements are the same' "]) presents a more difficult question. As defense counsel pointed out below, Katrina was not "[a]bsent from the hearing" because she was missing or out-of-state,[7] as in the typical case. The reason was that Mother, who was responsible for bringing young Katrina to court (§ 1328, subd. (b)(1)), objected to doing so. Because Katrina was not present in court refusing to testify, this case is also distinguishable from those in which the trial court must make a reasonable attempt to induce the witness to testify before finding them unavailable.

In any event, our analysis does not rise and fall on how neatly the established categories of unavailability apply to the circumstances before us. The fundamental question remains whether, in our independent judgment, the prosecution established that Katrina's live testimony was not available. (See *Smith*, *supra*, 30 Cal.4th at pp. 623–624; *Reed*, *supra*, 13 Cal.4th at pp. 226–228.) There were, essentially, two "layers" to Katrina's unavailability here. The first was Mother's reluctance to bring Katrina to court, and the second was Katrina's ability or willingness to testify once in court. Because the trial court found Katrina unavailable based on Mother's refusal, it did not reach the second "layer" of the analysis. In our view, however, the record fails to establish that Mother was absolutely refusing to bring Katrina to court.

---

7      The prosecutor represented that Mother lived in the county.

17

To be sure, substantial evidence supports the trial court's findings that the prosecution duly subpoenaed Mother; had maintained contact with her; and was essentially blindsided in the middle of trial when she suddenly decided she would not bring Katrina to court. We also appreciate that the prosecutor promptly alerted the court and defense counsel about the issue and arranged for Mother to appear before the court—telephonically, at defense counsel's request—for an unavailability hearing that same evening. We disagree, however, that this sufficed to show Katrina's unavailability.

The problem is that the overall focus of the unavailability hearing was determining why Mother did not want to bring Katrina to court, not the extent to which Mother was resolute in that position. Whether based on the prosecution's due diligence duty or the court's inducement duty, there are two points in the unavailability hearing where the questioning of Mother fell short. First, when the court offered various accommodations—providing a service dog, allowing Mother to serve as a support person, and arranging the courtroom so Katrina would not have to see Gomez—and asked whether Katrina would feel more comfortable testifying with all that in place, Mother responded, "I don't know" and changed the subject to the number of jurors that would be present in the courtroom. In our view, the prosecution or the court should have pressed Mother to consider the accommodations offered— perhaps overnight in discussion with Katrina—and unequivocally affirm that they, nor any other accommodations, would sufficiently alleviate her concern.[8]

---

[8] Before the unavailability hearing, the prosecutor generally represented that Mother "would not be bringing Katrina in, despite any accommodations that we were willing to offer." But the DA investigator did not discuss this point in his declaration supporting the motion to admit Katrina's prior statements.

18

Second, the prosecution had the court confirm that Mother received the subpoena to bring Katrina to trial, but it was *not* confirmed that Mother understood the subpoena was a court order that she was willing to violate to avoid bringing Katrina to court. As noted above, the "willful failure" of a parent to produce their child "at the time and place designated in [a] subpoena" is punishable as a contempt. (§ 1328, subd. (b)(1).) We are not suggesting the court needed to actually find Mother in contempt or even threaten to do so, especially considering that this is a case of sexual abuse. (See *Lawson*, *supra*, 52 Cal.App.5th at pp. 1129–1130 [in light of Code Civ. Proc., § 1219, it would be " ' "extreme" ' " to hold sexual assault victim in contempt before finding her unavailable]; *Cogswell*, *supra*, 48 Cal.4th at p. 478 [prosecution reasonably declined to request to have sexual assault victim taken into custody and transported from Colorado to California to testify].) But where a court is faced with a refusal to testify—or, as here, reluctance to bring a child witness to testify—the caselaw reflects the importance of impressing upon the refuser the solemnity of the court order and determining their resolve in refusing to testify *despite the order*. (See, e.g., *Lawson*, at p. 1129 [the prosecution advised the witness of the consequences of ignoring a subpoena and the court asked whether a contempt finding and a $1,000 fine would change her mind].)[9]

---

[9] The Attorney General suggests the prosecution "impliedly informed" Mother that she was refusing a court order by confirming that she "received the subpoena and understood its requirements." But the DA investigator's declaration merely states that Mother "confirmed she received the subpoena to bring her daughter Katrina . . . to court sent to her by email . . . ." There is no indication that Mother appreciated the significance of refusing to comply with the subpoena.

We also understand that the prosecution is not required to try "everything that can be suggested in hindsight" in order to establish good faith and due diligence. (*People v. Sanchez* (2016) 63 Cal.4th 411, 442; see also *People v. Diaz* (2002) 95 Cal.App.4th 695, 706 [" '[t]he law requires only reasonable efforts, not prescient perfection' "].) But considering that Katrina was a critical prosecution witness and Mother very suddenly changed her mind about bringing her to court to testify, it would have been reasonable to meaningfully explore available accommodations and to confirm that Mother understood she would be violating a court order if she failed to do so. In other words, the court needed to discern whether she *did not want to* bring Katrina to testify or *would not* bring her. Although the DA investigator averred in a declaration that Mother stated she "would not allow her daughter to be subjected to any more events causing her to be traumatized" and "would not bring Katrina to court." her statements in the subsequent unavailability hearing before the court were considerably more equivocal. For instance, she repeatedly stated she did not "want to put [Katrina] through this" again given the child-unfriendly environment of the preliminary hearing. In light of her less firm responses, focus on the courtroom environment, and prior cooperation with the prosecution, it would not have been plainly futile to press these two lines of inquiry a bit further.

To be clear, we are not suggesting that a parent's staunch refusal to bring their young child to court to recount a criminal offense committed against them can never support an unavailability finding. But on the record in this particular case, we are not convinced that Mother's refusal was so demonstrably solid. On such ambiguous terrain, it is the prosecution, not the defense, that must bear the consequences. (See *Barber*, *supra*, 390 U.S.

20

at p. 725 ["[t]he right of confrontation may not be dispensed with so lightly"].)[10]

## D.    *The Error Was Not Harmless Beyond a Reasonable Doubt*

Because the prosecution failed to demonstrate Katrina's unavailability, the trial court violated Gomez's constitutional right to confrontation in admitting Katrina's preliminary hearing testimony and forensic interview. (See *Stritzinger, supra,* 34 Cal.3d at p. 519.)  We must therefore determine whether the error was harmless beyond a reasonable doubt.  (*Id.* at p. 520, citing *Chapman v. California* (1967) 386 U.S. 18.)  In conducting this inquiry, we ask " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' "  (*Stritzinger,* at p. 520.)  "Where a fundamental constitutional right is at issue, erroneous evidentiary rulings are seldom harmless under this standard . . . ."  (*Ibid.*)

Gomez asserts the erroneous admission of the preliminary hearing and forensic interview requires reversal of all three lewd act offenses.  Without these prior statements, he argues, there was no evidence supporting the offenses against Katrina (counts 2 and 3).  The Attorney General specifically concedes that if the prior statements were improperly admitted, reversal of the offenses against Katrina is required.  We accept the concession.

As to the offense against Kane (count 1), Gomez argues that because the jurors were instructed with CALCRIM No. 1191B—which told them if they found beyond a reasonable doubt that he committed one or more lewd

_____

10    Since we conclude the preliminary hearing and forensic interview were improperly admitted based on the erroneous unavailability finding, we need not address Gomez's alternative claim that the forensic interview should not have been admitted because he did not have a sufficient opportunity, motive, and interest to cross-examine Katrina regarding her statements in the interview.

act offenses charged, they could conclude that he "was likely to commit and did commit the other sex offenses charged in this case"—the admission of Katrina's prior statements was prejudicial as to him as well. The Attorney General does not at all address the prejudicial impact the error might have had with respect to the offense against Kane. (See *In re Lopez* (2023) 14 Cal.5th 562, 585 ["The Attorney General bears the burden of showing that the error was harmless beyond a reasonable doubt"].)

Since the jury convicted Gomez of the lewd act offenses against Katrina, it necessarily found those offenses true beyond a reasonable doubt, and the instruction expressly allowed the jury to consider those offenses in deciding whether he committed the offense against Kane. Indeed, a finding that Gomez abused another child in the pool on the same day tends to undercut the defense theory that Kane's hand accidentally touched his crotch while they were shaking hands and treading water in the deep end of the pool. Given this record, the Attorney General's silence, and the exacting standard of prejudice, we agree we must reverse count 1 as well.

**DISPOSITION**

The judgment is reversed as to counts 1, 2, and 3 and the matter is remanded to the trial court for further proceedings.[11]

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

KELETY, J.

---

[11] Our reversal means that Gomez will eventually be resentenced. Accordingly, we need not decide his additional claims that the trial court erred in imposing sentence on count 3 (see fn. 4, *ante*) and in declining to stay (§ 654) one or two terms for the lewd act offenses.