Filed 6/29/26  P. v. Alaimalo CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087803 |
| Plaintiff and Respondent, | (Super. Ct. No. FVI23002398) |
| v. | |
| VAA ALAIMALO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Jon D. Ferguson, Judge.  Affirmed.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Eric A. Swenson and Anastasia Sagorsky, Deputy Attorneys General, for Plaintiff and Respondent.

Vaa Alaimalo appeals from a judgment after a jury verdict finding him guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)), felon in possession of a firearm (§ 29800, subd. (a)), and kidnapping (§ 207, subd. (a)).  The jury also found true a gun use enhancement as to the murder and kidnapping counts.  (§ 12022.53, subd. (b).)  Alaimalo argues the trial court prejudicially erred by admitting his codefendant's hearsay statements and that his counsel was ineffective to the extent he failed to preserve an objection to those statements.

We conclude that even though the court erred in admitting the codefendant's statements, the error was harmless.  We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We summarize only the facts relevant to our resolution of the issues on appeal.

*A.  Jaime Hernandez's Death*

Jaime Hernandez, his girlfriend M.P., and Kenneth Layton lived with Alaimalo in his Barstow, California home in 2018.  Hernandez, M.P., and Layton all bought and used heroin from Alaimalo, who was himself a frequent heroin user.  Kyle Galvin and Nicholas Yarbrough also spent time hanging out at Alaimalo's home.

On August 31, 2018, Hernandez was arrested for driving a stolen vehicle.  While Hernandez was in custody, Alaimalo asked M.P. if Hernandez was planning to rob him.  According to Layton, there was a rumor going around to that effect and earlier that week, Alaimalo was "telling everybody that he was going to do something."  M.P. told Alaimalo that Hernandez did say months ago that he was going to steal from Alaimalo, but she thought he

---

[1]     Undesignated statutory references are to the Penal Code.

only said it because he "was hurting for drugs" and that he "wasn't going to do it."  Yarbrough was present for this conversation, which happened in Alaimalo's room.

After he was released from jail on September 4, 2018, Hernandez returned to Alaimalo's home and smoked heroin with Galvin.  Later that evening, Layton was in his bedroom when Alaimalo texted him something along the lines of "it's about to go down."  Soon afterwards, Layton heard fighting in the living room.  When he went to the living room he saw Alaimalo and Yarbrough "jumping" Hernandez and punching him with their fists.  Hernandez appeared to lose consciousness, but Alaimalo and Yarbrough continued to hit him on the ground.  At one point Layton saw that Alaimalo and Yarbrough each had a gun in hand pointing down towards the floor.  After Layton saw the guns, he left the living room for a few minutes, and when he came back, Alaimalo and Yarbrough were putting Hernandez in handcuffs.  Alaimalo told Layton to get Alaimalo's car and pull it up close to the house.  Layton complied, then went straight into his room and stayed there the rest of the night.

The next morning on September 5, 2018, Layton learned that Hernandez had been killed.  Layton immediately packed his belongings, took down security cameras Alaimalo had installed inside and outside of the house, and removed a hard drive which stored the camera footage.  After destroying the surveillance equipment, he and Galvin disposed of the remnants.  Layton then spent a night using drugs in a motel room with Alaimalo.  When Layton returned to the house afterwards, he saw that it was mostly empty and that all of Alaimalo's personal belongings were gone.

## B. The Investigation

Officers found Jaime Hernandez's body the morning of September 5, 2018, in a rural area in San Bernardino County, California. He was handcuffed behind his back lying facedown near a formerly used highway. He had been shot ten times in the head and had abrasions, lacerations, and bruising on his face.

Officers searched Alaimalo's home on September 7, 2018. By then it appeared that whoever lived there had removed most of their belongings and moved out.

Yarbrough was arrested in Barstow on September 10, 2018, after a foot pursuit. While he was running from officers through yards and residential properties, Yarbrough tossed something into an adjoining yard which was later found to be a handgun.

Alaimalo was arrested a couple days later on September 12, 2018, at a motel in Phoenix, Arizona. At the time of his arrest, he was sharing a room with a woman, A.L., and her boyfriend, C.P. Alaimalo also had a handgun in his front pants pocket at the time of his arrest. Officers seized Alaimalo's white SUV, which was parked at the motel and matched descriptions of his vehicle provided by witnesses. A crime scene investigator detected the presence of blood on the front and rear portions of the passenger seat.

None of the casings collected at the crime scene, which were all discharged from the same firearm, matched the guns seized during Yarbrough's and Alaimalo's arrests.

## C. Additional Trial Evidence

At trial, the prosecution played a transcribed recording for the jury of a portion of Galvin's interview with a detective in August 2022. Galvin, who "started to tear up" early in the interview, described seeing Alaimalo and

4

Yarbrough "beat [Hernandez] up" at the house and being afraid for his life. He said he did not intervene because he "would've got killed too." After Alaimalo and Yarbrough put Hernandez in Alaimalo's vehicle, Galvin estimated they were gone for about 45 minutes. When they came back to the house, they both showered, and Alaimalo told Galvin not to go anywhere. Galvin said that the next day, after he and Layton disposed of the cameras, Alaimalo "held a gun out on" him, made Galvin get a motel room with him in Victorville for "a couple" days, and held him "hostage." While they stayed in the motel room, Alaimalo told Galvin that he had "dealt with" Hernandez, which Galvin understood to mean that Alaimalo killed him. Galvin described being "scared for [his] life" because Alaimalo said that Galvin would be next if he made any "stupid decisions."

Galvin said Hernandez was not the first person he had seen Alaimalo and Yarbrough "beatdown." According to Galvin, just a week before the incident with Hernandez, Alaimalo and Yarbough started giving Galvin a "beatdown" because they thought he had stolen drugs from them. When Galvin told Alaimalo that another person in the house was the one who stole from him, Alaimalo and Yarbrough proceeded to beat that person up.

The jury also heard a recording of an officer's interview with A.L. during which she described meeting Alaimalo at a gas station. After Alaimalo asked A.L. and C.P. if they knew anyone who wanted heroin, the three of them ended up sharing a motel room registered under C.P.'s name for a couple of nights where they smoked methamphetamine together. A.L. and C.P. took Alaimalo, who seemed to have no bags or personal belongings, out to get food and to buy new clothes at Alaimalo's request. At one point Alaimalo asked A.L. to search for Yarbrough's name using a "case look-up" internet site and they learned Yarbrough had been arrested for murder.

Alaimalo said that "they were at a house" and "something went down" because he "took this dude in" and "found out he was trying to rob from [Alaimalo]." A.L. described Alaimalo's voice as getting "really low" before he said that he wanted to see if his "homie" Yarbrough "took the rap." Alaimalo eventually told A.L. and C.P. that he was wanted for murder. Alaimalo also asked A.L. and C.P. whether he should move to Mexico or a different state where he could not be extradited. A.L. said that Alaimalo "had a nice little gun" that he kept in his pocket.

Several witnesses testified to having seen Alaimalo with a gun. M.P. testified that she saw Alaimalo with a gun once in his room at the house because "he showed everybody that was there." Layton testified that he had seen multiple guns in Alaimalo's room because sometimes "he would have them laid out, and sometimes he showed them to [Layton]." Layton also told law enforcement that he once sold a gun to Alaimalo in exchange for drugs.

D. *Yarbrough's Statements to Layton*

Midway through trial, the prosecution sought to introduce Layton's statements from a recorded interview with law enforcement recounting that Yarbrough told him something like, "We smacked him. V[aa] smack[ed] him. I smacked him. We had to smack him." When Layton asked Yarbrough what he meant by that, Yarbrough said, "He's dead now." After noting that the admissibility of those statements arose during an unreported sidebar about a different objection to another witness's testimony, the court heard arguments from both sides addressing whether a hearsay exception applied to Layton's statements. The People argued that Layton's recounting of Yarbrough's statements would be admissible under the hearsay exceptions for co-conspirator statements and a declaration against interest. The defense argued that Yarbrough's statements to Layton were not against his penal

6

interest because in that same conversation, Yarbrough also told Layton that Alaimalo was the one who "upped it," thereby shifting blame to Alaimalo and downplaying his own role.

The court found that Yarbough's statements, as relayed by Layton, were statements against interest because they assessed "equal blame to [Yarbrough] as the declarant, as well as to the defendant." In an exchange between the court and the parties later that day, the court explained that it was admitting Yarbrough's statements to Layton under Evidence Code section 1230, which provides that hearsay is admissible if the declarant is unavailable as a witness and the statement, when made, is contrary to the declarant's interests. The court stated that "obviously, Mr. Yarbrough has pled guilty to this and is pending sentencing, and has a constitutional right not to testify. So I do find him unavailable." Yarbrough was never called to testify and assert his Fifth Amendment privilege against self-incrimination, nor did his attorney appear in court to represent that Yarbrough would assert that privilege.

Yarbrough's statements to Layton were admitted through the testimony of Sergeant Tramayne Phillips, who conducted a recorded interview with Layton on September 7, 2018. Sergeant Phillips testified that Layton's demeanor during the interview was "emotional" and that Layton admitted to being untruthful during some early parts of the interview because he feared getting killed. Sergeant Phillips also testified that Layton recounted to him what Yarbrough had said: "We smacked him," "V[aa] smacked him," and that they "had to kill" Hernandez because "he was going to snitch." Layton understood "smack" to mean "kill." Yarbrough also told Layton that Alaimalo "upped it" and was the one who shot Hernandez.

7

After Yarbrough's statements were admitted, the court confirmed that it deemed his statements to be nontestimonial declarations against interest. The court also noted that the defense had objected to the admission of those statements.

## E. Trial Court Proceedings

The People charged Alaimalo and Yarbrough each with murder (§ 187, subd. (a)), being a felon in possession of a firearm (§ 29800, subd. (a)(1)), and kidnapping (§ 207, subd. (a)). The complaint further alleged as to the murder count that Alaimalo personally and intentionally discharged a firearm which proximately caused great bodily injury and death to Hernandez (§ 12022.53, subd. (d)); that he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); and that he personally used a firearm (§ 12022.53, subd. (b)). During trial the court granted the People's motion to amend the complaint to add the same firearm enhancement allegations to the kidnapping count. The information further alleged that Alaimalo had suffered a serious felony and strike prior. (§§ 667, subd. (a), 1170.12.)

Yarbrough pled guilty before trial to second degree murder and kidnapping. After Alaimalo's trial ended, Yarbrough was sentenced to a total term of 23 years to life.

Layton also pled guilty before trial to kidnapping, and he received time served and probation as part of a plea agreement requiring him to testify truthfully in Alaimalo's case.

At Alamailo's trial, the court instructed the jury on three theories it could use to find Alaimalo guilty of murder: first degree murder, felony murder with Alaimalo as the actual killer, and felony murder with Yarbrough as the actual killer. The court also instructed the jury that it need not

8

unanimously agree on the same theory to convict Alaimalo of murder, as long as they all agreed on the degree of murder.

After deliberating for about two days, the jury convicted Alaimalo of first degree murder, being a felon in possession of a firearm, and kidnapping. The jury also found true that Alaimalo personally used a firearm under section 12022.53, subdivision (b), as to the murder and kidnapping charges. The jury did not find true any of the other alleged firearm enhancements. In a bifurcated bench trial, the court found true the prior serious felony and strike allegations.

In October 2024, the trial court sentenced Alaimalo to 50 years to life for the murder and a consecutive determinate term of 15 years for the accompanying enhancements. The court stayed the sentences for the other counts under section 654.

## DISCUSSION

Alaimalo argues on appeal that the trial court erred by admitting Yarbrough's statements to Layton because the hearsay exception for statements against interest did not apply for two reasons: (1) Yarbrough was not "unavailable" for purposes of the hearsay exception; and (2) Yarbrough's statements were not "specifically" against his penal interests. Alaimalo further argues that to the extent his counsel failed to adequately raise an objection to Yarbrough's statements on the basis of unavailability, his counsel was ineffective.[2]

We first conclude that Alaimalo's counsel properly preserved his objection to Yarbrough's statements. We further find that the court erred by

---

[2]     Alaimalo also argues in his opening brief that Evidence Code section 1223—which provides an exception to the hearsay rule for statements made during the existence of a conspiracy that are in furtherance of its objective—does not apply. But he also observes in his brief that the court "did not seem

9

admitting the statements because the prosecution failed to show Yarbrough was "unavailable." We conclude, however, that the error was harmless, and therefore affirm. We need not and do not decide whether Yarbrough's statements were against his penal interests.

### A. Governing Law

We review the trial court's "determination of issues concerning the hearsay rule" for abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590; *People v. Gordon* (1990) 50 Cal.3d 1223, 1252 ["As we have explained, a ruling on the admissibility of evidence as a declaration against interest is broadly reviewed for abuse of discretion: the heart of the exception is the basic trustworthiness of the declaration, and that question is entrusted to the trial court's discretion."].)

Evidence Code section 1230 provides in relevant part that "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." Evidence Code section 240, which defines when a witness may be deemed unavailable, includes when a person is "[e]xempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant." (*Id.*, subd. (a)(1).) "The burden of proof on the issue of witness unavailability rests with the proponent of the evidence, and the

---

to find the co-conspirator exception applicable," and the People's respondent's brief does not cite Evidence Code section 1223, let alone argue why it should apply. Accordingly, we treat the issue as abandoned and do not address it here. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

showing must be made by competent evidence." (*People v. Stritzinger* (1983) 34 Cal.3d 505, 516 (*Stritzinger*); see also *People v. Gomez* (2025) 115 Cal.App.5th 943, 957 (*Gomez*).)

### B. Analysis

We begin by addressing whether Alaimalo's counsel adequately preserved an objection to Yarbrough's statements on hearsay grounds, even though his counsel did not specifically object to the court's finding that Yarbrough was unavailable. Evidence Code section 353 provides that a "verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence" unless the record shows that "an objection to or a motion to exclude or strike the evidence . . . was timely made and so stated as to make clear the specific ground of the objection or the motion." (*Id.*, subd. (a).) "An objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide. [Citations.] In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented." (*People v. Scott* (1978) 21 Cal.3d 284, 290.) No "particular form of objection" is required, but the objection must be made in such a way "as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility." (*People v. Williams* (1988) 44 Cal.3d 883, 906 (*Williams*).) We consider the circumstances under which an objection is made to determine its sufficiency. (*Id.* at p. 907.)

Here, the court acknowledged on two occasions at trial that the defense had raised the issue of Yarbrough's statements being inadmissible hearsay. On both occasions, the court addressed at length the hearsay exception that is now at issue on appeal: statements against interest. The court first heard

11

a proffer from the prosecution about the nature of Yarbrough's statements, then later made a point of making a finding on the record regarding Yarbrough's unavailability. The record thus shows that the court was well aware of the nature of both the anticipated evidence and the basis on which exclusion was sought, even though the "particular form of objection" was not included in the record. (*Williams, supra*, 44 Cal.3d at p. 906.) Accordingly, we conclude that Alaimalo preserved his hearsay objection to Yarbrough's statements.[3]

We next consider whether the trial court erred in finding that Yarbrough was unavailable. We conclude it did. It is well established that "in order to assert the privilege against self-incrimination a witness must not only be called but must also be sworn." (*People v. Ford* (1988) 45 Cal.3d 431, 440.) The witness may then invoke their privilege in response to specific questions, and the trial court is in a position to decide whether the answer might tend to incriminate the witness. (*Id.* at p. 441.) In some limited circumstances, courts have allowed a witness's counsel to assert the privilege on the witness's behalf. (See, e.g., *People v. Brooks* (2024) 99 Cal.App.5th 323, 335 [concluding witness could assert privilege through counsel without being called and sworn]; *People v. Apodaca* (1993) 16 Cal.App.4th 1706, 1715 [assertion of privilege deemed valid when counsel asserted privilege on witness's behalf during her sworn testimony, and counsel was "clearly acting under the authorization of the client"].)

Here, the trial court found Yarbrough unavailable because he had pled guilty, was awaiting sentencing, and had "a constitutional right not to

---

3      We therefore need not and do not address whether his counsel's performance was ineffective.

12

testify." But Yarbrough was never called, sworn, or made to invoke his privilege against self-incrimination. Nor did any counsel who purported to represent him assert the privilege on his behalf. The prosecution apparently made no effort to call Yarbrough as a witness, choosing instead to rely solely on the *existence* of his right to assert the privilege without showing that he was, in fact, *exercising* that right. It was incumbent upon the prosecution to establish admissibility as the proponent of the evidence. (See *Stritzinger, supra*, 34 Cal.3d at p. 516; *Gomez, supra*, 115 Cal.App.5th at p. 957; see also *Williams, supra*, 44 Cal.3d at p. 906.) Because the prosecution failed to meet its burden of demonstrating that Yarbrough was unavailable for purposes of applying the hearsay exception under Evidence Code section 1230, we conclude the court erred in admitting Yarbrough's statements to Layton.

We therefore turn to the question of prejudice. When the trial court has committed an error in admitting hearsay evidence, we generally apply the standard of prejudice for state law errors set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Duarte* (2000) 24 Cal.4th 603, 618–619; see *People v. Jasso* (2025) 17 Cal.5th 646, 673 [California Supreme Court has "repeatedly explained that ordinary application of state evidence law generally raises no constitutional issue."].) Alaimalo contends that the standard from *Chapman v. California* (1967) 386 U.S. 18 applies because the admission of Yarbrough's statements implicated his Sixth Amendment confrontation rights. But the United States Supreme Court has held that the admission of *nontestimonial* statements "is the concern of state and federal rules of evidence, not the Confrontation Clause." (*Michigan v. Bryant* (2011) 562 U.S. 344, 359; see *People v. Gallardo* (2017) 18 Cal.App.5th 51, 66 (*Gallardo*).) Alaimalo does not dispute the trial court's finding that Yarbrough's statements to Layton were nontestimonial, and there is no

evidence indicating Yarbrough's statements were given with the purpose of establishing or proving some past fact for possible use in a criminal trial. (See *Gallardo*, at p. 67.) Accordingly, we apply the *Watson* standard in determining whether any error is harmless. (See also *People v. Tran* (2022) 13 Cal.5th 1169, 1194–1197 [Sixth Amendment protections for admission of nontestifying codefendant's confession implicating the defendant apply only to testimonial statements].)

Under *Watson*, error is reversible if the reviewing court determines upon examining " 'the entire cause, including the evidence,' " that "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.)

We conclude that the error here was harmless under *Watson*. Even setting aside Yarbrough's statements that Alaimalo "upped it" or that he and Alaimalo "smacked" Hernandez, the jury also heard both Galvin and Layton describing how they saw Alaimalo and Yarbrough assaulting Hernandez the night he was killed. Layton described receiving a text from Alaimalo indicating something was about to happen right before the fighting started. Layton personally observed Alaimalo and Yarbough each holding a gun and handcuffing Hernandez before Alaimalo asked Layton to pull up the car. Both Layton and M.P. confirmed that Alaimalo had suspicions that Hernandez was going to rob him, and according to Galvin, Alaimalo and Yarbrough had been violent towards another person they suspected of stealing just a week earlier. The jury heard Galvin describe how Alaimalo "held a gun out on" him, made Galvin get a motel room with him in Victorville for "a couple" days, threatened him, and held him "hostage." Galvin even told law enforcement that Alaimalo said he had "dealt with"

14

Hernandez, which Galvin understood to mean that Alaimalo had killed him. Layton described how Alaimalo's personal belongings were gone from his house just days after Hernandez was killed, indicating Alaimalo had fled. The jury heard a recording of A.L. recounting how Alaimalo had no personal belongings when she met him at the motel in Phoenix, he asked her to search for information about Yarbrough, he mentioned someone had tried to rob him, he said he was wanted for murder, and he asked about fleeing to another country or a non-extradition state. Lastly, evidence of blood was found in Alaimalo's car. Given all of this evidence, we conclude it is not reasonably probable that Alaimalo would have obtained a more favorable result even if Yarbrough's statements had been excluded.

Alaimalo argues that the error was especially prejudicial in connection with the jury's finding that he personally used a firearm in the commission of the murder and kidnapping. But even without Yarbrough's statements, there was more than sufficient evidence to support a true finding for that enhancement. The trial court instructed the jury that "someone personally uses a firearm if he or she intentionally . . . displays the weapon in a menacing manner[.]" The jury heard evidence that Layton saw Alaimalo with a gun in his hand the night he and Yarbrough attacked Hernandez. Galvin said Alaimalo "held a gun out on him" in a motel the next night, multiple witnesses testified that Alaimalo owned firearms, and Alaimalo was found with a gun at the time of his arrest. Moreover, the jury did not find true the more serious gun enhancements for discharging a firearm (§ 12022.53, subd. (c)) or discharging a firearm and proximately causing death (§ 12022.53, subd. (d)), which indicates the jury did not fully credit Yarbrough's erroneously admitted statements that Alaimalo was the actual killer. We therefore conclude it is not reasonably probable the jury would

15

have made a finding more favorable to Alaimalo on the gun enhancements in the absence of error.

DISPOSITION

The judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.